

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-30-2005

# Estate Robert Smith v. Marasco

Precedential or Non-Precedential: Precedential

Docket No. 04-2146

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Estate Robert Smith v. Marasco" (2005). *2005 Decisions.* Paper 175.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/175

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 04-2146

_____

ESTATE OF ROBERT CECIL SMITH; PAULINE SMITH,
INDIVIDUALLY AND AS ADMINISTRATOR OF THE
ESTATE OF ROBERT C. SMITH; DANA SMITH; WANDA
SMITH,

*Appellants*

v.

TROOPER JAMES MARASCO; TROOPER NICHOLAS
SCIANNA; TROOPER THOMAS WEAVER; TROOPER
ANDREW L. WENGER; CAPTAIN MICHAEL J.
MARCANTINO; LIEUTENANT BERRY REED;
LIEUTENANT EDWARDS; LIEUTANT SCHAEFFER;
LIEUTANT SNYDER; CORPORAL DANTE; ROBERT
JOHNSON; CORPORAL GREG HALL; JOHN DOE #10-#25,
WHOSE NAMES ARE CURRENTLY UNKNOWN; DANTE
ORLANDI; THOMAS GREGORY HALL, TEDESCUNG L.
BANDY; BARRY L. BRINSER; GREGORY BROADDUS;
CARBONELL; COLON; JOHN R. COMERER, JR.; GLENN
C. DOMAN; JOHN EDWARDS; WAYNE S. ELSER; FRANK
L. FETTEROLF; DAVID FRISK; GILLISON; JAMES A.
HAMILL; MARTIN L. HENRY, III; JOSEPH KALIS; A. J.
KRAWCZEL; WILLIAM J. MCCLURE; THOMAS
MCDANIEL; SHAWN MELL; ARTHUR MOSS, JR.;
WILLIAM MOYER; ED MURPHY; KEVIN REICHERT;
CHARLES RODGERS; MERVIN RODRIQUEZ; THOMAS
RODRIQUEZ; KEITH A. STONE; GREGORY STUMPO;
DOMINIC G. VISCONTI; WILLIAM WHITE; JOSEPH
WILSON; GREGORY WIRTH; MICHAEL WITMER;
KENNETH YODER; JOHN DOE #1-#25

_____

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. No. 00-cv-05485)
District Judge: Honorable Franklin S. Van Antwerpen

_____

Argued March 7, 2005

Before: SCIRICA, *Chief Judge*, ROTH and BECKER, *Circuit
Judges*

(Filed: November 30, 2005)

GERALD J. WILLIAMS, ESQ.
ANDREW F. ERBA, ESQ.
GERALD J. GRANT, JR., ESQ.
Williams, Cuker & Berezofsky
1617 John F. Kennedy Boulevard
One Penn Center, Suite 800
Philadelphia, PA 19103

JORDAN B. YEAGER, ESQ. (Argued)
Boockvar & Yeager
8 West Oakland Avenue
Doylestown, PA 18901

*Attorneys for Appellants*

GERALD J. PAPPERT
Attorney General
J. BART DeLONE (Argued)
Senior Deputy Attorney General
CALVIN R. KOONS
Senior Deputy Attorney General
JOHN G. KNORR, III
Chief Deputy Attorney General
Chief, Appellate Litigation Section
Office of Attorney General
Appellate Litigation Section
15th Floor, Strawberry Square

Harrisburg, PA 17120

*Attorneys for Appellees*

_____

OPINION

_____

BECKER, *Circuit Judge*.

This strange civil rights case is before us for a second time, *see Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003) (*Smith I*), in the form of an appeal by the Estate of Robert Cecil Smith from an order of the District Court entered following remand and additional discovery. Plaintiffs filed suit under 42 U.S.C. § 1983, arguing that defendants had violated Smith's constitutional rights in the hours prior to his death. The District Court, for the second time, granted summary judgment to all defendants on all claims.

For the reasons that follow, we will affirm in part, reverse in part, and remand for further proceedings. More specifically, we will reverse with respect to the claim that defendants Fetterolf, Hall, and Marcantino used excessive force in violation of the Fourth Amendment, and with respect to the claim that defendants Marasco and Scianna conducted an unreasonable search, also in violation of the Fourth Amendment. However, we will affirm the District Court's grant of summary judgment on all other claims against all defendants, on the grounds of either: (1) lack of their personal involvement in the putative constitutional violations; (2) the absence of a genuine issue of material fact that might give rise to liability on the Fourth Amendment excessive force and the Fourteenth Amendment state-created danger claims; or (3) the presence of qualified immunity with respect to those claims.

Because of the multiplicity of defendants, and the fact that several claims are asserted against each, we will address the defendants and claims, where possible, in groups.

I. Facts and Procedural History

Plaintiffs' decedent, Robert Smith, was a Vietnam veteran who suffered from a variety of mental and physical ailments, including Post-Traumatic Stress Disorder (PTSD), flashbacks to Vietnam, and serious heart problems. Prior to his death, Smith had had several encounters with members of the state police, Troop L Reading. The encounters stemmed primarily from an ongoing feud between Smith and one of his neighbors, Robert Shafer. On a previous occasion, Shafer had accused Smith of shooting out a light Shafer installed on his property. The state police investigated the incident, but they did not charge Smith, although many of the troopers believed that he was responsible for the shooting. As a result of their interaction, some of the troopers had at least limited knowledge of Smith's medical problems, although the extent of their knowledge is disputed by the parties.

On the afternoon of July 10, 1999, the state police received a complaint from Shafer alleging that Smith was shining a bright light into his backyard. Troopers James Marasco and Nicholas Scianna responded to the call and proceeded to Smith's residence several hours later. After not receiving a response at the front door, the troopers went around the house to see if they could locate Smith in his closed-in back porch.

After they were unable to find Smith behind his house, the troopers returned to their car and called their barracks for further instructions. They spoke with Corporal Mervin Rodriguez, who instructed them to attempt to contact Smith by phone, but, in the event they were unable to reach him, to leave a citation on the property and return to the barracks. After their own efforts to contact Smith over the phone were unsuccessful, the two troopers asked the barracks Personal Communication Officer (PCO) to attempt to reach Smith.

While they were waiting for the PCO to respond, the troopers returned to Smith's backyard. During this time, Trooper Scianna observed a red light in one of the windows of the house, which he first assumed to be a light from a video camera. He then noticed a red dot on Trooper Marasco's clothing, and at that point assumed that the light was a laser sight from a firearm. Fearing for their safety, the troopers retreated to their vehicle and called the barracks for assistance.

The two officers again spoke with Corporal Rodriguez, who instructed them to secure the area. Rodriguez requested backup from local police officials and proceeded to Smith's house himself, arriving there around 11 p.m. By this point, additional officers, including Trooper Thomas Rodriguez, had arrived at the scene and formed a perimeter around Smith's house.

Shortly after arriving and joining the perimeter, Trooper Rodriguez observed a figure leave the house through the back door, cross the yard, and enter a nearby tool shed. He later testified that the individual appeared to be carrying something under his arm. Rodriguez observed the figure return to the house, only to leave again a few minutes later. At this point, he called out to the individual but received no response. Acting at Trooper Rodriguez's suggestion, Corporal Rodriguez then ordered the officers to tighten the perimeter around the yard in order to cut off access to the house.

At around 11:30 p.m., Corporal Rodriguez contacted Lieutenant Frank Fetterolf, requesting that Fetterolf activate the Special Emergency Response Team (SERT), a state police unit trained to deal with high-risk, volatile situations. Fetterolf relayed the request to the SERT coordinator, Corporal Gregory Hall, who contacted the members of SERT and instructed them to proceed to Smith's residence.

At about 1:30 a.m., the SERT team began to arrive. Some thirty members of SERT, "wearing riot gear and camouflage and armed with various weapons," responded. *Smith I*, 318 F.3d at 503. Sometime after SERT began to assemble, Fetterolf asked Lieutenant Frank Weaver to investigate the incident involving the apparent laser sight and, if necessary, obtain a warrant. Weaver did so and obtained an arrest warrant for Smith, charging him with aggravated assault, simple assault, and reckless endangerment.[1] At around the same time, Trooper Andrew Wenger also obtained a search warrant for the residence. In addition, at some point during the evening, Fetterolf spoke with Captain Michael Marcantino, Troop

---

[1]The arrest warrant was withdrawn on July 12, 1999. *See Smith I*, 318 F.3d at 504.

5

Commander for Troop L, who was camping on the night of the 10th, to update him on SERT's activities.

After arriving, Fetterolf and Hall established a command post from which they directed SERT's activities for the remainder of the night. They tried to contact Smith using the telephone and a public address system, but were unsuccessful. At around 5 a.m., they ordered SERT members to break several of Smith's windows with rocks in an effort to induce him to communicate with them. One hour later, SERT members entered Smith's shed using tear gas. Finally, at 6:43 a.m., members the SERT team stormed Smith's house using "flash-bang distraction devices," small explosives designed to briefly disorient and stun anyone in the immediate vicinity.

After SERT cleared Smith's residence, state troopers executed the search warrant. They were unable to find Smith inside his house, but they did locate his identification as well as heart medication that he was required to take in the wake of a recent operation. They also recovered several weapons, although they did not find one with a laser sight.

At some point after clearing the house, the troopers began to search the wooded area behind Smith's yard. During this time, Smith's two daughters and at least two other individuals contacted the state police in an effort to assist in locating Smith. The police generally rebuffed these efforts, citing safety concerns. However, they did permit one of Smith's neighbors, Christopher Zwicky, to join them in a helicopter search of the woods behind Smith's house. The police discovered Smith's cellular phone in the woods, but were unable to locate Smith. After approximately two hours, they abandoned the search.

About one week later, a friend of Smith's discovered his body in the same woods, not far from where his phone was found. Smith had died of heart failure brought on, according to the Smiths, by the stress of the evening.

Smith's estate and various family members ("the Smiths") then filed suit against numerous police officials, named and unnamed, who were involved in the events of the evening. The suit alleged violations of the First, Fourth, and Fourteenth Amendments as well as numerous violations of state law. After discovery, the District Court granted summary judgment for all defendants on all claims, finding that plaintiffs could not show

6

that any of Smith's constitutional rights were violated. The Smiths appealed, and, in *Smith I*, we affirmed in part and reversed in part.

We held that defendants were not entitled to summary judgment on three claims: the Smiths' claim that Officers Marasco and Scianna conducted an unreasonable search in walking around to the back of Smith's house and in entering Smith's garage; the Smiths' claim that the officers responsible for activating and directing SERT used excessive force in doing so, in violation of the Fourth Amendment; and the Smiths' claim that the use of SERT and other actions by the officers amounted to a state-created danger in violation of Smith's substantive due process rights under the Fourteenth Amendment. We affirmed with regard to all other federal claims raised.

On remand, following additional discovery, the District Court again granted summary judgment with respect to all federal claims. It again held that plaintiffs could not establish that Troopers Marasco and Scianna conducted an unreasonable search in walking into Smith's backyard. With respect to the excessive force and state-created danger claims, the District Court concluded that all defendants were entitled to summary judgment, on the grounds that they either lacked sufficient personal involvement in the events leading to Smith's death or that they were entitled to qualified immunity. Qualified immunity was not at issue in the first appeal.

The Smiths then filed a second appeal to this Court. Insofar as the appeal challenges the District Court's determinations regarding the personal involvement of defendants Doman, Krawczel, Carbonell, Weaver, and Wenger, it may be summarily disposed of and we do so in the margin.[2] We

_____

[2] The District Court granted summary judgment in favor of defendants Doman, Krawczel, Carbonell, Weaver, and Wenger on the grounds that they were not sufficiently involved in the events that allegedly led to Smith's death to be held liable. In essence, the Court concluded that there was insufficient evidence in the record for a reasonable jury to conclude that any of these defendants had violated Smith's civil rights. We agree with the District Court in this regard, and will affirm the grant of summary judgment with

respect to these five defendants.

Sergeant Glen Doman served as the leader of SERT's negotiation team on the evening of the 10th. In addition, he was responsible for maintaining the command post log. Sergeant A.J. Krawczel served on SERT's negotiation team that evening and assisted in gathering information. He interviewed Shafer concerning the earlier fight between the two neighbors, and he later contacted the Lebanon Veterans' Administration Hospital in order to obtain information regarding Smith's medical condition. He then prepared a report detailing his findings. The report was logged in at the command post at 3:10 a.m. We agree with the District Court that there is no basis for a reasonable jury to conclude that either trooper violated Smith's constitutional rights. While both troopers were members of SERT, there is no evidence that either had any operational control or was otherwise responsible for the decisions that were made that evening.

Corporal Martin Carbonell was a member of SERT and served in the SERT command center the night of the incident. At some point in the evening, Carbonell spoke with Trooper Thomas Weaver and advised Weaver to obtain a warrant. Other than this conversation, the Smiths have pointed to no evidence from which a jury could conclude that Carbonell violated Smith's constitutional rights, and we find none. Similarly, we do not see any reasonable argument for concluding that the advice Carbonell gave to Weaver violated Smith's rights.

Weaver and Wenger's involvement was limited to obtaining the search and arrest warrants. We held in *Smith I* that probable cause existed to obtain the warrants, and there is no basis for reconsidering that ruling. *See* 318 F.3d at 522. The Smiths nonetheless argue that Weaver misrepresented certain material facts in his affidavit in support of his warrant application. For instance, the Smiths allege that Weaver submitted a firearms report for a "Robert Charles Smith" (rather than "Robert Cecil Smith") in conjunction with the warrant application. We agree with the District Court that this error does not amount to a violation of Smith's constitutional rights. There is no dispute that Smith owned several legal firearms, and we believe that probable cause to obtain the warrants would have existed independent of the firearms report.

8

also set forth the familiar standard of review in the margin.[3]

We recognize that Trooper Weaver had greater knowledge of Smith's medical condition than many of the other officers at the scene. Weaver was aware that Smith suffered from heart problems and had been present on a previous occasion when Smith suffered from an apparent Vietnam flashback. Yet this history does not change the fact that the Smiths have not pointed to any actions taken by Weaver on the evening in question that could lead a reasonable jury to conclude that he violated Smith's constitutional rights. The same is true of Trooper Wenger, who was less familiar with Smith's condition. We therefore conclude that no reasonable jury could have concluded that Weaver or Wenger violated Smith's constitutional rights.

[3]Since the District Court granted summary judgment to all defendants, we exercise plenary review. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing a decision to grant summary judgment as to any particular claim on the basis of qualified immunity, we conduct a two-step inquiry. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, we ask whether a reasonable jury could conclude that the victim's constitutional rights were violated by the defendant. Second, we ask whether a reasonable officer in the defendant's position would have been aware that his conduct violated the victim's constitutional rights. More specifically, the second question requires us to ask whether the right the defendant stands accused of violating was "clearly established" at the time of the incident in question. If the answer to either question is no, then the defendant is entitled to summary judgment

The Supreme Court has emphasized that the purpose of qualified immunity is to spare the defendant from having to face trial if a reasonable officer in his position would not have recognized that his conduct violated the Constitution. *Id.* at 200-02. Therefore, courts have an obligation to conduct the qualified immunity inquiry at the earliest possible point before trial. However, in reviewing a motion for summary judgment on the basis of qualified immunity, normal principles of summary judgment still apply, and any disputes of fact must be resolved in

9

## II. The Excessive Force Claim

Use of excessive force by a state official effectuating a search or seizure violates the Fourth Amendment. As we noted in *Smith I*, "[t]o state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." 318 F.3d at 515 (quoting *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999)). In *Smith I*, we held that SERT's activities constituted a seizure, and that the only remaining question was whether the force used in doing so was reasonable. *See id.* at 515.[4] We identified several factors that a court should consider in determining whether a seizure was reasonable, including "the severity of the crime at issue," "whether the suspect poses an immediate threat to the safety of the officers or others," and "whether he actively is resisting arrest or attempting to evade arrest by flight." 318 F.3d at 515 (citations omitted).

In setting aside the District Court's initial decision, we concluded that it had failed adequately to address all of these factors. In particular, we emphasized the need to consider "the severity of the threat to which officers were responding." *Id*. at 516. We observed that, while Smith was known to possess firearms, there

> was no indication that Smith had been using a gun recently or that Smith ever [had] used a gun in a violent manner. No arrest was made, and [evidence suggests] that an arrest warrant was not even sought until after SERT was activated. Most importantly, there is no indication in the record

favor of the plaintiff. Thus, if there are factual disputes that are material to the question whether a reasonable officer in the defendant's position would have realized that his conduct violated the victim's constitutional rights, it is inappropriate to grant summary judgment.

[4]The District Court's first opinion addressed the question whether a seizure had occurred in considerable detail. *See* 227 F. Supp. 2d at 340-43.

that Smith had any history of violence of which the officers may have been aware." 318 F.3d at 517. We therefore reversed the District Court's determination that no constitutional violation had occurred.

On remand, the District Court concluded that the troopers were entitled to qualified immunity on the excessive force claim. In so doing, it disputed this Court's finding that Smith did not have a history of violence in light of "the quite violent past conduct of Smith in shooting out his neighbor's lights and riddling his neighbor's home with bullet holes." 2004 U.S. Dist LEXIS 5613 at *35. The District Court suggested that perhaps the *Smith I* panel was not aware of the incident in which Smith allegedly fired at Shafer's lights, although the opinion in *Smith I* did mention it several times. *See, e.g.*, 318 F.3 at 515. While we agree with the District Court that some of our statements in *Smith I* did not fully reflect the troopers' understanding of Smith's volatile nature, we nonetheless believe that we considered all relevant facts in our decision.[5]

In holding that all defendants were entitled to qualified immunity on the excessive force claim, the District Court relied heavily on its earlier analysis. In its review of the excessive force claim, the District Court did not consider the actions of each defendant individually, nor did it distinguish between the

---

[5]The Smiths argue that, because Smith was never criminally charged and there was no conclusive evidence that he was responsible for shooting out Shafer's lights, the police were unjustified in believing that Smith was prone to violence. We disagree. While there may not have been sufficient evidence to charge Smith with a crime, several troopers testified that they believed that he was, in fact, responsible for shooting out Shafer's lights. The Smiths have pointed to no evidence from which we could conclude that this testimony was false or that the troopers were unreasonable in their belief that Smith has shot at Shafer's lights. Therefore, it was not unreasonable for the troopers to consider this incident in planning their response on the evening of the 10th.

11

decision to activate SERT and SERT's later activities once the team arrived at Smith's house. Rather, it found that the troopers' understanding of Smith's past history, coupled with their knowledge that he possessed firearms and their belief that he had targeted Marasco with a laser sight, would have led a reasonable officer to conclude that the force that was later used was not excessive. Based on our review of the record, we believe that it is necessary to distinguish between the initial decision to activate SERT and the subsequent decision to storm Smith's shed and house.

## A. The Decision to Activate SERT

We agree with the District Court that all officers are entitled to qualified immunity with respect to the decision to activate SERT. We stressed in *Smith I* that a decision to employ a SWAT-type team can constitute excessive force if it is not "objectively reasonable" to do so in light of "the totality of the circumstances." 318 F.3d at 515. As we noted, the question whether the use of force is "objectively reasonable" is determined by analyzing several factors. We looked to the factors listed in our decision in *Sharrar v. Felsing*, 128 F.3d 810 (3d Cir. 1997), as well as those in the Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386, 396 (1989). In *Sharrar* we held that a reasonable officer must consider:

> the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. . . [whether] the physical force applied was of such an extent as to lead to injury . . . the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time.

12

128 F.3d at 821-22 (internal quotations omitted).

Sharrar was decided two years before the events at issue in this case. Therefore, it is appropriate for us to rely on that decision in our analysis of whether the officers are entitled to qualified immunity, as the contours of the right at issue here—as set forth in Sharrar—were "clearly established" at the time the troopers decided to activate SERT. A reasonable officer would be guided by the Sharrar factors in determining whether to use overwhelming force in a given situation. Thus, if an officer applies the Sharrar analysis in an unreasonable manner, he is not entitled to qualified immunity.

Based on the record before us, we cannot conclude that the troopers applied the Sharrar factors in an unreasonable manner in choosing to activate SERT. We held in Smith I that the Smiths had offered sufficient evidence to make the question whether "the decision to activate SERT . . . [was] objectively reasonable," see 318 F.3d at 516, appropriate for resolution by a jury, and we do not disturb that conclusion today. We do find, however, that, even if the decision to activate SERT was objectively unreasonable, a reasonable officer would not have thought his conduct to be unlawful. Thus, even if the troopers violated Smith's constitutional rights in activating SERT, they are entitled to qualified immunity with respect to that decision.

As the District Court noted, the troopers believed that Smith was armed and that he had targeted a police officer with a laser-sighted weapon.[6] Thus, at the time the decision to activate SERT was made, the troopers could reasonably have believed that Smith posed a serious threat. In addition, the troopers apparently made the decision to activate SERT without full knowledge of Smith's medical condition. While Marasco and Scianna had some understanding of Smith's health problems, there is no evidence that they were involved in the decision to activate SERT. The troopers who were responsible for the decision to activate SERT—which involved M. Rodriguez,

---

[6]The Smiths submit that there is evidence in the record suggesting that the laser sight actually came from somewhere in the wooded area behind Smith's house, rather than the house itself. This does not change our analysis in any meaningful respect.

13

Fetterolf, and Hall, among the remaining defendants—had limited knowledge of Smith's condition at the time the decision was made. Thus, it was not unreasonable for them to conclude that the display of force entailed in the activation of SERT was not "of such an extent as to lead to injury."[7]

The Smiths suggest that, because others in the Troop were aware of Smith's health problems, we can impute this knowledge to the entire troop. We disagree. In order to prevail on a § 1983 claim against multiple defendants, a plaintiff must show that each individual defendant violated his constitutional rights. Thus, to the extent that knowledge of Smith's medical condition would alter the excessive force inquiry as to individual defendants, the Smiths must point to some evidence from which we could conclude that those particular defendants had knowledge of Smith's condition.

For the foregoing reasons, we affirm the District Court's grant of summary judgment with respect to this aspect of the Smiths' claim.

## B. The Storming of Smith's House and Shed

Our conclusion that a reasonable officer would not have

---

[7]In *Smith I*, we suggested that the fact that SERT was activated before a warrant had been obtained was relevant to the question whether the use of force was excessive. *See* 318 F.3d at 517. Several defendants testified that, absent exigent circumstances, SERT is typically not activated unless a warrant has been issued or steps have been taken to obtain one. While this fact is certainly relevant to the reasonableness inquiry, we do not think it outweighs the other factors which militate in favor of concluding that a reasonable officer would not have concluded that the decision to activate SERT violated Smith's Fourth Amendment rights. As we held in *Smith I*, probable cause existed for the police to obtain an arrest warrant for Smith. *See* 318 F.3d at 515. Their failure to do so prior to the decision to activate SERT does not necessarily imply that a reasonable officer would have realized that activating SERT violated Smith's constitutional rights.

14

believed that the decision to activate SERT was unlawful does not necessarily entail that the same is true of all subsequent decisions regarding the use of SERT. Our review of the *Sharrar* factors leads us to conclude that, when the facts are viewed in the light most favorable to the plaintiffs, a reasonable officer would have concluded that the decision to storm Smith's shed and house using flash-bang distraction devices violated Smith's constitutional rights.

We reach this conclusion for several reasons. First, the immediacy and severity of the threat had significantly lessened in the time between the activation of SERT and the decision to enter Smith's house. More precisely, at least six hours had elapsed between Marasco and Scianna's call to the PCO and the storming of Smith's house. *See* 318 F.3d at 517. During this time, with the exception of the possible sighting in the backyard, the troopers had had no contact with Smith. Thus, while a reasonable officer could have concluded that the initial nature of the threat justified activating SERT, we also think that a reasonable officer would have reassessed the danger Smith posed during the intervening hours.

More importantly, during the time that elapsed between the activation of SERT and the decision to storm Smith's house and shed, the members of SERT had learned a great deal more about Smith's medical condition. By the time the decision to storm the house was made, the leadership of the SERT team was aware that Smith had heart problems and that he suffered from flashbacks to Vietnam. Given Smith's medical condition, a reasonable officer would have concluded that the physical force used "was of such extent to lead to injury." *See Sharrar*, 128 F.3d at 822. Indeed, plaintiffs' police practices expert, Dr. Paul McCauley, concluded that the officers' conduct "fell below accepted police practices" for dealing with Emotionally Disturbed Persons (EDPs). We therefore think that, under these circumstances, a reasonable officer would have recognized that an assault on Smith's house involving the use of flash-bang distraction devices, and a similar assault on his shed using tear gas constituted an excessive use of force.

We recognize that, in certain situations, the volatile nature of a suspect will weigh in favor of a greater show of force. In all such cases, however, the officer's actions must be evaluated in

15

light of the factors listed in *Sharrar*. When viewing the facts in the light most favorable to the Smiths, we believe that a reasonable officer would have concluded that, at the time the decision was made, Smith did not pose a threat that was sufficiently serious and immediate as to require storming his house.[8] At all events, a reasonable officer would have recognized the significant risk that Smith would suffer serious harm as a result of the decision to do so. Balancing these considerations, we think that a reasonable officer would have concluded that storming the house would violate Smith's constitutional rights.

It is useful to compare the decision to activate SERT with the decision to enter Smith's house and shed using the tactics employed here. There can be no dispute that the force employed in storming the house and shed was far greater than that used in the deployment of SERT. In addition, as the result of the report of Trooper Krawczel, *see supra* n. 2, the troopers had at least some more knowledge of Smith's medical condition at the time they decided to storm the house than they did at the time SERT was activated. Finally, we think a reasonable officer would have concluded that the threat posed by Smith had lessened in the intervening several hours. Thus, in areas critical to the *Sharrar* analysis, the decision to storm Smith's house was less justified than the decision to activate SERT.[9]

_____

[8]There is some evidence that the troopers were concerned about the possibility that Smith's wife, who was not present that evening, might be at risk. If the officers reasonably believed they were dealing with a hostage situation, then our analysis would be very different. However, there is insufficient evidence in the record for us to conclude that the decision to enter Smith's house was made primarily out of a concern for Mrs. Smith's safety. Indeed, Trooper Marasco testified that, at some point that night, he learned that Mrs. Smith was away.

[9]The officers submit that the facts of *Sharrar* itself require us to conclude that it would not have been clear to a reasonable officer that the force used in this case was unreasonable. In *Sharrar*, the police responded to a report from a woman who had been assaulted by four men, including her estranged husband, who

We therefore conclude that the District Court erred in granting summary judgment to defendants Fetterolf and Hall with respect to the decision to storm Smith's house and shed. Fetterolf and Hall were responsible for directing the other members of the SERT team, and thus were responsible for the decision to enter Smith's residence and shed. In addition, we conclude that the District Court erred in granting summary judgment with respect to defendant Marcantino. Marcantino, who served as the Troop Commander for Troop L, was camping in Huntington, Pennsylvania on the night of the 10th. Fetterolf testified that he contacted Marcantino and that Marcantino approved of the plan to enter Smith's residence. Marcantino testified that he spoke to Fetterolf, but he did not indicate that he approved the decision to enter the residence. He claimed that he gave Fetterolf no directions. At this stage, however, we must assume that a jury would credit Fetterolf's version. If Marcantino did, in fact, approve the decision to enter the residence as well as the methods employed to do so, he is not entitled to qualified immunity.

## III. The State-Created Danger Claim

---

beat her with a gun and threatened to murder her for allegedly informing the FBI about the husband's involvement in a local drug ring. *See* 128 F.3d at 814–15. The police tracked the men to the husband's house, at which point they activated the SWAT team. They instructed the men to exit the building, which they did voluntarily. When they emerged, the police ordered them to lie face down in the dirt, screamed obscenities, and threatened them verbally and with weapons. In a subsequent § 1983 action, this Court affirmed a grant of summary judgment for the defendants, finding that the force used was not excessive. *See id.* at 820–22. We think that there is one clear difference between this case and *Sharrar*. In *Sharrar*, the actions of the officers were calculated primarily to frighten the plaintiffs into submission and were likely to lead to, at worst, minor physical injuries. In this case, however, the troopers should have been aware that their actions were likely to cause Smith serious, if not fatal, harm.

17

The Smiths also argue that defendants violated Smith's Fourteenth Amendment rights under the "state-created danger" doctrine. In order to prevail on a state-created danger claim, a plaintiff must prove

> (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in willful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the [harm] to occur.

*Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995). *Smith I* held that the second element of this test is only satisfied by conduct that "shocks the conscience." *See* 318 F.3d at 507. Although this requirement is but one element of the test, it is often the most difficult for a plaintiff to show, and thus our ultimate conclusion frequently turns on our determination of whether given conduct "shocks the conscience." For this reason, we will focus our analysis on this element.

As we noted in *Smith I*, the question whether a given action "shocks the conscience" has an "elusive" quality to it. *See* 318 F.3d at 509; *cf. Herrera v. Collins*, 506 U.S. 390, 428 (1993) (Scalia, J., dissenting) (questioning "the usefulness of 'conscience shocking' as a legal test"). As the Supreme Court has observed:

> Whether the point of the conscience-shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but "less than intentional conduct, such as recklessness or 'gross negligence,'" 474 U.S. at 334, n.3, is a matter for closer calls.

*County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). Our own decisions have not clarified this element of the test to any great extent; indeed, in *Smith I*, we applied the somewhat circular definition that conduct shocks the conscience if it

18

exhibits "a level of gross negligence or arbitrariness that indeed 'shocks the conscience.'" 318 F.3d at 508.

Still, our decisions do give us some guidance as to how to determine whether a given action "shocks the conscience." As we have previously noted, "[t]he exact degree of wrongfulness necessary to reach the 'conscience-shocking' level depends upon the circumstances of a particular case." *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999). In particular, we must determine whether the officer is confronted with a "hyperpressurized environment" such as a high-speed chase, or, in the alternative, has "the luxury of proceeding in a deliberate fashion." *See Smith I*, 318 F.3d at 509. In the latter case, "deliberate indifference" may be sufficient to "shock the conscience," *e.g.*, *Lewis*, 523 U.S. at 850; in the former, it is usually necessary to show that the officer deliberately harmed the victim, *see id.* at 852.

In *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 66 (3d Cir. 2002), we determined that conscience-shocking behavior requires proof that the "defendants consciously disregarded, not just a substantial risk, but a great risk that serious harm would result." That opinion, however, did not deal with the question whether this standard applied to cases raising state-created danger claims.[10]

---

[10]*Ziccardi* observed:

In *Kneipp v. Tedder*, 95 F.3d 1199 (3d Cir. 1996), which preceded *Lewis*, we held that deliberate indifference sufficed in a case in which state actors placed the plaintiff in a dangerous situation and the plaintiff was harmed by a nongovernmental actor. The case before us is not a "state created danger" case and is not governed by Kneipp.

288 F.3d at 65 n.5. *Ziccardi* followed our decision in *Smith I*. In *Smith I*, we concluded that *Miller* applied the "shocks the conscience" element to all § 1983 cases raising substantive due process claims, including state-created danger claims. We think that the definition adopted in *Ziccardi* is useful in assessing such

The question we must address, of course, is not simply whether the behavior of the troopers "shocks the conscience" under the applicable standard, but whether a reasonable officer would have realized as much. In this regard, "the salient question" we must ask is whether the law, as it existed in 1999, gave the troopers "fair warning" that their actions were unconstitutional. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002). It is not necessary for the plaintiffs to identify a case presenting analogous factual circumstances, but they must show that the contours of the right at issue were "'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* at 739 (citation omitted).

While the jurisprudence does not yield a clear definition of "conscience-shocking" (applicable to situations such as this), we agree with the District Court that the Smiths have not shown that a reasonable officer in the position of these troopers would have understood his conduct to be "conscience-shocking."[11] We therefore conclude that the troopers are entitled to qualified immunity with respect to the state-created danger claim.

The decisions cited by the Smiths are not to the contrary. For instance, in *Rivas v. City of Passaic*, 365 F.3d 181 (3d Cir. 2004), we considered a situation in which two paramedics responded to a call from a man who was apparently having a seizure. According to the paramedics, the man became belligerent and attacked them, and they called for police assistance. Upon arriving, the police restrained the man, and in so doing caused his death.

In a subsequent § 1983 action, we held that the paramedics were not entitled to qualified immunity on a state-created danger claim. We relied on the fact that there were disputed issues of material fact that needed to be resolved by a

---

claims.

[11]As the Supreme Court has acknowledged, the question whether conduct which is neither intentionally harmful nor merely negligent "shocks the conscience" is frequently "a matter for closer calls." *Lewis*, 523 U.S. at 849. Yet the qualified immunity jurisprudence teaches us that "closer calls" are usually to be resolved in favor of the officer.

20

jury. Most importantly, we noted that a reasonable jury could conclude that the paramedics had falsely told the police that the man had attacked them and further failed to communicate to the police that he had suffered from a seizure and therefore should not be restrained. *See* 396 F.3d at 196. Such behavior, we concluded, shocked the conscience, and a reasonable paramedic would have recognized as much.

The facts of this case are not analogous. The deception of the paramedics in *Rivas* led the police to restrain the seizure victim in that case, even though the paramedics knew that it was inappropriate to do so. We concluded that a reasonable paramedic would recognize that such behavior is not only inappropriate, but conscious-shocking. In this case, the wrongfulness of the troopers' conduct was not nearly as clear. While there is sufficient evidence in the record for a reasonable jury to conclude that the troopers were negligent, we simply cannot conclude that a reasonable officer in their position would have recognized that his conduct shocked the conscience. For this reason, the troopers are entitled to qualified immunity with respect to this claim.

This conclusion applies to all of the actions taken by the troopers that could arguably support a state-created danger claim, including the formation of the initial perimeter around Smith's house, the activation of SERT, and the subsequent search in the woods.[12] None of these decisions appears to have "consciously disregarded, not just a substantial risk, but a great risk that serious harm would result." *Ziccardi*, 288 F.3d at 66. There is evidence from which a reasonable jury could conclude that the

---

[12]Since we conclude that the Smiths have a viable Fourth Amendment claim with regard to the entrance into the house and shed, we need not address that claim as a separate Fourteenth Amendment violation. *See United States v. Lanier*, 520 U.S. 259, 272 (1997) ("[I]f a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.").

troopers' efforts to locate Smith in the woods were inadequate.[13] That said, we see nothing in the record that would permit us to conclude that a reasonable officer would have known that the conduct of the search was "conscience shocking."

We recognize that, in *Rivas*, we held that

> as of November 1998, our case law had established the general proposition that state actors may not abandon a private citizen in a dangerous situation, provided that the state actors are aware of the risk of serious harm and are partly responsible for creating the opportunity for that harm to happen.

365 F.3d at 200. Yet we think a reasonable officer could recognize a difference between abandoning a private citizen with whom he had come in contact and failing to prolong a two-hour search for a private citizen whom he has been unable to locate, *see supra* n.13. At this stage, such a difference is sufficient for the officers to be entitled to qualified immunity.

For the foregoing reasons, we will affirm the District

---

[13]The deposition testimony of Smith's neighbor, Christopher Zwicky, supports the view that the search was inadequate. Zwicky approached the command center upon hearing a helicopter overhead and, after learning what had happened the previous evening, offered to help with the search. The police refused to let Zwicky enter the woods but did allow him to go up in the helicopter to help direct the search. In addition, according to Zwicky, the police also reviewed an aerial photograph of the surrounding area with him. Zwicky testified that he told the police that there were two areas where Smith was likely to hide: a deer blind and what he described as a "super thick sticker patch." According to Zwicky, the police located the deer blind, but made little or no effort to find the second location. Indeed, according to his testimony, "[the police] bagged it and went home" after finding the deer blind. Zwicky further testified that he remained in the command post for another hour, but "they had pretty much decided they were going to quit for the day then. As the District Court found, the search of the woods lasted about two hours.

22

Court's grant of summary judgment on the state-created danger claim. In doing do, we acknowledge that the panel in *Smith I* held that the Smiths had "produced sufficient evidence to allow a reasonable jury to conclude that the officers' conduct both with regard to activating SERT and with regard to searching of the woods shocked the conscience." 318 F.3d at 509. We think, however, that the question whether a reasonable officer would have had "fair warning" at the time that his conduct shocked the conscience is sufficiently different to warrant the result we reach. The difference may be subtle, but the shocks the conscience standard is somewhat vague, and we are satisfied that fair warning was absent here.

Because we conclude that the Smiths cannot show that a reasonable officer would have recognized that his conduct was "conscience-shocking," we need not address the other elements of the state-created danger test. We will therefore affirm the decision of the District Court that all defendants were entitled to qualified immunity with respect to the state-created danger claim.

## IV. The Unreasonable Search Claim

Finally, we must address the unreasonable search claim against Troopers Marasco and Scianna. In its first opinion, the District Court held that Marasco's and Scianna's entry into Smith's backyard was reasonable, in light of the fact that they were responding to a complaint concerning light shining from Smith's property. On appeal, we rejected this analysis, finding that the troopers had entered Smith's "curtilage" and that disputes of fact existed which could impact whether the entry was reasonable.[14] We repudiated the view "that officers may proceed to the back of a home when they do not receive an answer at the front door any time they have a legitimate purpose for approaching the house in the first place," *Smith I*, 318 F.3d at 519-20.

---

[14]A person's curtilage is the area immediately adjacent to his home in which he has a legitimate expectation of privacy. *See United States v. Dunn*, 480 U.S. 294, 300 (1987).

23

More specifically, we observed:

> In addition, Marasco had been to Smith's residence in the past and had been in Smith's backyard once or twice before. A jury could conclude that he therefore knew that the Smith residence did not have a back entrance as seems to be the case. If Marasco had such knowledge, then this is not a case where the officers necessarily acted reasonably in proceeding to the back of the house to find another entrance after receiving no answer at the front door. . . . It also appears that here the officers entered the backyard at least twice, spending a more significant amount of time looking around Smith's property than did the officers in *Raines* and *Anderson* in looking around the properties involved there, and that the officers here did so despite having been instructed to leave if they did not receive an answer to their initial attempts to contact Smith. Furthermore, the district court did not address the fact that Marasco testified about entering Smith's garage after receiving no answer. The record indicates that the garage was in fact a part of the structure of the house itself.

> In the circumstances, there remain questions of fact as to whether the officers' intrusion into the curtilage was reasonable in light of their asserted purpose in making their entry into Smith's property which was not to make a search.[15]

318 F.3d at 521.

On remand, the District Court again granted summary judgment for Marasco and Scianna. The Court concluded that

---

[15]We also held that inquiries into the reasonableness of such searches must be conducted on a case-by-case basis.

certain facts rendered the search inherently reasonable, namely that the officers "knew there to be a back porch that Smith sometimes sat on"; that "there were lights on in the home, the garage door was open and there were vehicles in the driveway"; and that it "was necessary to locate Smith in order to turn off the lights that were shining on Shafers' property late that night." *See* 2004 U.S. Dist. LEXIS 5613 at *15-*16.[16]

We agree with the District Court that it was reasonable for the officers initially to enter the backyard in order to ascertain whether Smith was sitting on his fenced-in back porch.[17] As we observed in *Smith I*:

> Where officers are pursuing a lawful objective, unconnected to any search for the fruits and instrumentalities of criminal activity, their entry into the curtilage after not receiving an answer at the front door might be reasonable as entry into the curtilage may provide the only practicable way of attempting to contact the resident . . . where the front door was inaccessible. Similarly, officers reasonably may believe, based on the facts available to them, that the person they seek to interview may be located elsewhere on property within the curtilage . . . and, [in such] cases, an officer's brief entry into the curtilage to test this belief might be justified.

318 F.3d at 520. Given that the troopers believed Smith to be home but did not receive a response when they knocked on his door, as well as the fact that they knew he occasionally sat in the fenced-in porch, it was not unreasonable for them to enter the

---

[16]The District Court also found that the troopers had not, in fact, violated Smith's curtilage. *2004 U.S. Dist LEXIS 5613* at *14 n.1. However, we concluded in *Smith I* that they had done so (based on the initial findings by the District Court), *see* 318 F.3d at 519, and we are bound by this conclusion.

[17]The fact that the porch apparently did not have a door leading to the backyard is irrelevant to this analysis.

backyard for the limited purpose of ascertaining whether he was on the porch.

However, as we noted in *Smith I*, the troopers apparently entered Smith's backyard on two separate occasions. *See id*. At his deposition, Trooper Marasco testified that, after being unable to locate Smith on the porch, he returned to his car and contacted Corporal Rodriguez. At that point, according to his deposition testimony, he and Trooper Scianna returned to the backyard and waited there while the PCO attempted to reach Smith. In fact, Marasco testified that he and Scianna were simply "buying time" while waiting for the PCO to contact Smith. It was at this point that Trooper Marasco observed the red dot on Trooper Scianna.

We cannot conclude, based on the record before us, that this second entrance into Smith's backyard was objectively reasonable. Indeed this result is essentially compelled by *Smith I*, as we have explained it. The troopers were justified in entering the curtilage for the purpose of determining whether he was sitting on his back porch; once they determined that he was not, their justification for remaining in his yard ended. As we observed in *Smith I*, when officers reasonably believe that "the person they seek to interview may be located elsewhere on property within the curtilage," then a "brief entry into the curtilage to test this belief might be justified." *Id*. While the troopers' first entrance into Smith's backyard was consistent with this principle, the second was not. For this reason, it was error for the District Court to conclude that Marasco and Scianna were entitled to summary judgment on the unreasonable search claim.[18]

_____

[18]In *Smith I*, we held that the District Court erred in granting defendants' summary judgment on the unreasonable search claim and remanded so that the District Court could "address the specific conduct of the defendants in determining whether they are entitled to qualified immunity on these claims." *See* 318 F.3d at 521 n.13. However, the District Court did not focus on the qualified immunity issue. Judge Roth would hold that the second trip around the house was not an unreasonable search, relying on *United States v. Rohrig*, 98 F.3d 1506 (6th Cir. 2003). *Rohrig* depends upon the existence of exigent circumstances which were found in that case

## V. Conclusion

We will affirm the District Court's grant of summary judgment with respect to defendants Doman, Krawczel, Carbonell, Weaver, Wenger, T. Rodriguez, and M. Rodriguez. We will affirm the District Court's grant of summary judgment to defendants Marasco and Scianna on all claims with the exception of the unreasonable search claim. We will affirm the grant of summary judgment with respect to defendants Fetterolf, Hall, and Marcantino, with the exception of the excessive force claim pertaining to the decision to storm Smith's house and shed. Concomitantly, we will reinstate the state-law claims dismissed by the District Court.[19]

---

because of the need to abate loud music late at night that was disturbing the neighborhood. We do not believe that the bright lights that shone from Smith's house onto Shafer's property are comparable.

[19]The District Court, having granted summary judgment for the defendants on all the federal claims, dismissed the pendent state claims. On this second remand, the District Court should examine the state claims and proceed with those that are not effectively disposed of by this opinion.

ROTH, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority's conclusions in Parts II and III of its opinion. I respectfully dissent, however, from the conclusion in Part IV that Troopers Marasco and Scianna's second trip by the back of the house, while they were trying to contact Smith by telephone, constituted an unreasonable search – or that a reasonable officer would understand that what he was doing violated the right against unreasonable searches. In view of the facts, acknowledged by the majority – that the troopers knew there was a back porch that Smith sometimes sat on, that there lights on in the house, that the garage door was open, that there were vehicles in the driveway, and that they wanted to locate Smith, who they believed to be in the house, in order to have him turn off the lights shining on Shafers' property – I conclude that the second trip around the house, while the telephone contact was being attempted, was not an unreasonable search. Smith had created a public nuisance that was affecting his neighbor, and the steps taken by Marasco and Scianna were reasonable efforts to abate it. *See, e.g., United States v. Rohig*, 98 F.3d 1506, 1518-25 (6th Cir. 2003) (holding that officers' warrantless entry to locate and abate loud music late at night was justified by exigent circumstances).[20] We should not permit the tragic consequences, caused by the later unreasonable assault on the house, to color our consideration of actions that, if the later tragedy had not ensued, would surely not be the cause of any claim of constitutional violation.

For the above reasons, I would affirm the grant of summary judgment to Troopers Marasco and Scianna on the claim of unreasonable search.

---

[20] In *Smith I*, we held that we expressed no opinion as to whether we would have found the circumstances presented *Rohrig* to be exigent. 318 F.3d at 521, n. 11. I conclude that bright lights directed at a neighbor's property late at night, in view of the history of friction between the neighbors, was a circumstance that required a reasonable effort to get the lights turned off if Smith was home and that the effort here was reasonable.