SACK, Circuit Judge,
joined by Judges CALABRESI, POOLER, and PARKER, concurring in part and dissenting in part.
The opinion of the en banc majority[1] departs from the opinion of the panel majority in two important and salutary respects.
First, the Court now explicitly acknowledges that “this is not a typical immigration case.” Supra at 570. We would prefer that the Court concede that this is not an immigration case at all — it is about the alleged unconstitutional treatment of an alien suspected of terrorism — but we welcome the resulting decision not to dismiss Arar’s claims as jurisdictionally barred by the Immigration and Nationality Act (“INA”), see supra at 569, and not to rely, in the Court’s Bivens analysis, upon the INA’s remedial scheme and the well nigh unlimited executive power that the INA bestows, see supra at 572. Compare Arar v. Ashcroft, 532 F.3d 157, 169-71 & n. 10, 179-81 (2d Cir.2008) (“Arar Panel Op.”).
In its second departure from the panel decision, the Court declines to hold that if, as Arar alleges, government conduct “denied [him] effective access to consular assistance, the courts, his lawyers, and family members in order to effectuate his removal to Syria,” Arar’s constitutional rights would not have thereby been violated. Supra at 569 (internal quotation marks omitted); compare Arar Panel Op., 532 F.3d at 184-89. We agree with this approach too. Indeed, we think both of these departures are significant enough in themselves to have rendered the unwieldy and often wasteful en banc process worthwhile here.
We disagree, however, with the majority’s continued insistence that Arar cannot employ a Bivens remedy to seek compensation for his injuries at the hands of government agents. The majority reaches that conclusion by artificially dividing the complaint into a domestic claim that does *583 not involve torture — viz., “[Arar’s] claim regarding detention in the United States,” supra at 563 — and a foreign claim that does — viz., “[Arar’s] claims for detention and torture in Syria,” id. The majority then dismisses the domestic claim as inadequately pleaded and the foreign claim as one that cannot “be asserted under Bivens ” in light of the opinion’s “dominant holding” that “in the context of involuntary rendition, hesitation is warranted by special factors.” Supra at 563.
In our view, even treating Arar’s claim for mistreatment while in United States custody and denial of access to United States counsel and United States courts as, arguendo, a claim that is entirely isolated from the remainder of Arar’s allegations, it was adequately pleaded in his highly detailed complaint.
As we will explain, however, the complaint’s allegations cannot properly be divided into claims for mistreatment in the United States and “claims for detention and torture in Syria.” Arar’s complaint of mistreatment sweeps more broadly than that, encompassing a chain of events that began with his interception and detention at New York’s John F. Kennedy Airport (“JFK”) and continued with his being sent abroad in shackles by government agents with the knowledge that he would likely be tortured as a result. Viewed in this light, we conclude that Arar’s allegations do not present a “new context” for a Bivens action.
And even were it a new context, we disagree with what appears to be the en banc majority’s test for whether a new Bivens action should be made available: the existence vel non of “special factors counselling hesitation.” First, we think heeding “special factors” relating to secrecy and security is a form of double counting inasmuch as those interests are fully protected by the state-secrets privilege. Second, in our view the applicable test is not whether “special factors” exist, but whether after “paying particular heed to” them, a Bivens remedy should be recognized with respect to at least some allegations in the complaint. Applying that test, we think a Bivens remedy is available.
We hasten to add that under the proper formulation of the test, we might well agree with the en banc majority that a Bivens action is not available in the context of an alien’s “claims for detention and torture in Syria.” But, as we will explain, Arar’s allegations are not so limited.
Our overriding concern, however, is with the majority’s apparent determination to go to whatever length necessary to reach what it calls its “dominant holding”: that a Bivens remedy is unavailable. Such a holding is unnecessary inasmuch as the government assures us that this case could likely be resolved quickly and expeditiously in the district court by application of the state-secrets privilege.
What is at stake on this appeal is not whether Arar will, through this litigation, obtain compensation for the injury he suffered as a result of the malfeasance of employees of the United States. In light of the many hurdles he would have to surmount,[2] he would be extremely unlikely to do so. Rather, the question for the Court is, and has from the outset been, the manner by which that likely result will (or will not) be reached. We fear that the majority is so bound and determined to declare categorically that there is no Bivens action in the present “context,” that it unnecessarily makes dubious law.
*584 For those reasons, we respectfully dissent.[3]
I. Arar’s Allegations
The majority’s recitation of the facts, see supra 563-66, is generally accurate, but anodyne. A complete assessment of the majority opinion and the implications of the Court’s decision is not possible without a fuller account of the troubling allegations contained in Arar’s complaint.
“Because this is an appeal from a dismissal of a complaint under Fed.R.Civ.P. 12(b)(6), we view the allegations of the complaint in the light most favorable to appellant.” Paycom Billing Servs. v. Mastercard Int’l, Inc., 467 F.3d 283, 285 (2d Cir.2006). The district court’s opinion carefully and fully sets forth Arar’s allegations. See Arar v. Ashcroft, 414 F.Supp.2d 250, 252-57 (E.D.N.Y.2006). We adhere to that account nearly verbatim.[4]

A. Arar’s Apprehension, Detention, and Forcible Transportation to Syria

Arar, who is in his thirties, is a native of Syria. He immigrated to Canada with his family when he was a teenager. He is a dual citizen of Syria and Canada. He resides in Ottawa. (Arar, 414 F.Supp.2d at 252.)
In September 2002, while vacationing with his family in Tunisia, he was called back to work by his employer[5] to consult with a prospective client. He purchased a return ticket to Montreal with stops[6] in Zurich and New York. He left Tunisia on September 25, 2002. (Id.)
On September 26, 2002, Arar arrived from Switzerland at JFK to catch a connecting flight to Montreal. Upon presenting his passport to an immigration inspector, he was identified as “the subject of a ... lookout as being a member of a known terrorist organization.” Compl. Ex. D (Decision of J. Scott Blackman, Regional Director) at 2. He was interrogated by various officials for approximately eight hours.[7] The officials asked Arar if he had contacts with terrorist groups, which he categorically denied. Arar was then transported to another site at JFK, where he was placed in solitary confinement. He alleges that he was transported in chains and shackles and was left in a room with no bed and with lights on throughout the night. (Arar, 414 F.Supp.2d at 253.)
The following day, starting at approximately 9:00 a.m., two FBI agents interrogated Arar for about five hours, asking him questions about Osama bin Laden, Iraq, and Palestine. Arar alleges that the agents yelled and swore at him throughout the interrogation. They ignored his re *585 peated requests to make a telephone call and see a lawyer. At 2:00 p.m. that day, Arar was taken back to his cell, chained and shackled, and provided a cold McDonald’s meal — his first food in nearly two days. (Id.)
That evening, Arar was given an opportunity to voluntarily return to Syria, but refused, citing a fear of being tortured if returned there and insisting that he be sent to Canada or returned to Switzerland. An immigration officer told Arar that the United States had a “special interest” in his case and then asked him to sign a form, the contents of which he was not allowed to read. That evening, Arar was transferred, in chains and shackles, to the Metropolitan Detention Center (“MDC”) in Brooklyn, New York,[8] where he was strip-searched and placed in solitary confinement. During his initial three days at MDC, Arar’s continued requests to meet with a lawyer and make telephone calls were refused. (Id.)
On October 1, 2002,[9] the Immigration and Naturalization Service (“INS”) initiated removal proceedings against Arar, who was charged with being temporarily inadmissible because of his membership in al-Qaeda, a group designated by the Secretary of State as a foreign terrorist organization. Upon being given permission to make one telephone call, Arar called his mother-in-law in Ottawa, Canada. (Id.)
Upon learning of Arar’s whereabouts, his family contacted the Office for Consular Affairs (“Canadian Consulate”)[10] and retained an attorney, Amal Oummih, to represent him. The Canadian Consulate had not been notified of Arar’s detention. On October 3, 2002, Arar received a visit from Maureen Girvan from the Canadian Consulate, who, when presented with the document noting Arar’s inadmissibility to the United States, assured Arar that removal to Syria was not an option. On October 4, 2002, Arar designated Canada as the country to which he wished to be removed. (Id.)
On October 5, 2002, Arar had his only meeting with counsel. The following day, he was taken in chains and shackles to a room where approximately seven INS officials questioned him about his reasons for opposing removal to Syria. His attorney was not provided advance notice of the interrogation, and Arar further alleges that U.S. officials misled him into thinking his attorney had chosen not to attend. During the interrogation, Arar continued to express his fear of being tortured if *586 returned to Syria. At the conclusion of the six-hour interrogation, Arar was informed that the officials were discussing his case with “Washington, D.C.” Arar was asked to sign a document that appeared to be a transcript. He refused to sign the form. (Id. at 253-54.)
The following day, October 7, 2002, attorney Oummih received two telephone calls informing her that Arar had been taken for processing to an INS office at Varick Street in Manhattan, that he would eventually be placed in a detention facility in New Jersey, and that she should call back the following morning for Arar’s exact whereabouts. However, Arar alleges that he never left the MDC and that the contents of both of these phone calls to his counsel were false and misleading. (Id. at 254.)
That same day, October 7, 2002, the INS Regional Director, J. Scott Blackman, determined from classified and unclassified information that Arar is “clearly and unequivocally” a member of al-Qaeda and, therefore, “clearly and unequivocally inadmissible to the United States” under 8 U.S.C. § 1182(a)(3)(B)(i)(V). See Compl. Ex. D. at 1, 3, 5. Based on that finding, Blackman concluded “that there are reasonable grounds to believe that [Arar] is a danger to the security of the United States.” Id. at 6 (brackets in original). (Arar, 414 F.Supp.2d at 254.)
At approximately 4:00 a.m. on October 8, 2002, Arar learned that, based on classified information, INS regional director Black-man had ordered that Arar be sent to Syria and that his removal there was consistent with Article Three of the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (“CAT”). Arar pleaded for reconsideration but was told by INS officials that the agency was not governed by the “Geneva Conventions” and that Arar was barred from reentering the country for a period of five years and would be admissible only with the permission of the Attorney General. (Id.)
Later that day, Arar was taken in chains and shackles to a New Jersey airfield, where he boarded a small jet airplane bound for Washington, D.C. From there, he was flown to Amman, Jordan, arriving there on October 9, 2002. He was then handed over to Jordanian authorities, who delivered him to the Syrians later that day. At this time, U.S. officials had not informed either Canadian Consulate official Girvan or attorney Oummih that Arar had been removed to Syria. Arar alleges that Syrian officials refused to accept Arar directly from the United States. (Id.)
Arar’s Final Notice of Inadmissability (“Final Notice”) ordered him removed without further inquiry before an immigration judge. See Compl. Ex. D. According to the Final Notice: “The Commissioner of the Immigration and Naturalization Service has determined that your removal to Syria would be consistent with [CAT].” Id. (brackets in original). The Final Notice was dated October 8, 2002, and was signed by Deputy Attorney General Larry Thompson. After oral argument in the district court on the defendants’ motions to dismiss, in a letter dated August 18, 2005, counsel for Arar said that Arar had received the Final Notice within hours of boarding the aircraft taking him to Jordan. (Arar, 414 F.Supp.2d at 254.)

B. Arar’s Detention in Syria

During his ten-month period of detention in Syria, Arar alleges, he was placed in a “grave” cell measuring six feet long, seven feet high, and three feet wide. The cell was located within the Palestine Branch of the Syrian Military Intelligence (“Palestine Branch”). The cell was damp and cold, contained very little light, and *587 was infested with rats, which would enter the cell through a small aperture in the ceiling. Cats would urinate on Arar through the aperture, and sanitary facilities were nonexistent. Arar was allowed to bathe himself in cold water once per week. He was prohibited from exercising and was provided barely edible food. Arar lost forty pounds during his ten-month period of detention in Syria. (Id.)
During his first twelve days in Syrian detention, Arar was interrogated for eighteen hours per day and was physically and psychologically tortured. He was beaten on his palms, hips, and lower back with a two-inch-thick electric cable. His captors also used their fists to beat him on his stomach, his face, and the back of his neck. He was subjected to excruciating pain and pleaded with his captors to stop, but they would not. He was placed in a room where he could hear the screams of other detainees being tortured and was told that he, too, would be placed in a spine-breaking “chair,” hung upside down in a “tire” for beatings, and subjected to electric shocks. To lessen his exposure to the torture, Arar falsely confessed, among other things, to having trained with terrorists in Afghanistan, even though he had never been to Afghanistan and had never been involved in terrorist activity. (Id. at 255.)
Arar alleges that his interrogation in Syria was coordinated and planned by U.S. officials, who sent the Syrians a dossier containing specific questions. As support for this allegation, Arar notes that the interrogations in the United States and Syria contained identical questions, including a specific question about his relationship with a particular individual wanted for terrorism. In return, Arar alleges, the Syrian officials supplied U.S. officials with all information extracted from Arar; Arar cites a statement by one Syrian official who has publicly stated that the Syrian government shared information with the United States that it extracted from him. See Compl. Ex. E (January 21, 2004 transcript of CBS’s Sixty Minutes II: “His Year In Hell”). (Id.)

C. Arar’s Contact with the Canadian Government While Detained in Syria

The Canadian Embassy contacted the Syrian government about Arar on October 20, 2002, and the following day, Syrian officials confirmed that they were detaining him. At this point, the Syrian officials ceased interrogating and torturing Arar. (Id.)
Canadian officials visited Arar at the Palestine Branch five times during his ten-month detention. Prior to each visit, Arar was warned not to disclose that he was being mistreated. He complied but eventually broke down during the fifth visit, telling the Canadian consular official that he was being tortured and kept in a grave. (Id.)
Five days later, Arar was brought to a Syrian investigation branch, where he was forced to sign a confession stating that he had participated in terrorist training in Afghanistan even though, Arar states, he has never been to Afghanistan or participated in any terrorist activity. Arar was then taken to an overcrowded Syrian prison, where he remained for six weeks. (Id.)
On September 28, 2003, Arar was transferred back to the Palestine Branch, where he was held for one week. During this week, he heard other detainees screaming in pain and begging for their torture to end. (Id.)
On October 5, 2003, Syria, without filing any charges against Arar, released him into the custody of Canadian Embassy officials in Damascus. He was flown to Otta *588 wa the following day and reunited with his family. (Id.)
Arar contends that he is not a member of any terrorist organization, including alQaeda, and has never knowingly associated himself with terrorists, terrorist organizations, or terrorist activity. Arar claims that the individual about whom he was questioned was a casual acquaintance whom Arar had last seen in October 2001. He believes that he was removed to Syria for interrogation under torture because of his casual acquaintance with this individual and others believed to be involved in terrorist activity. But Arar contends “on information and belief’ that there has never been, nor is there now, any reasonable suspicion that he was involved in such activity. Compl. ¶ 2. (Arar, 414 F.Supp.2d at 255-56 (footnote omitted).)
Arar alleges that he continues to suffer adverse effects from his ordeal in Syria. He claims that he has trouble relating to his wife and children, suffers from nightmares, is frequently branded a terrorist, and is having trouble finding employment due to his reputation and inability to travel in the United States. (Id. at 256.)

D. U.S. Policy Relating to Interrogation of Detainees by Foreign Governments

The complaint alleges on information and belief that Arar was removed to Syria under a covert U.S. policy of “extraordinary rendition,” according to which individuals are sent to foreign countries to undergo methods of interrogation not permitted in the United States. The extraordinary rendition policy involves the removal of “non-U.S. citizens detained in this country and elsewhere and suspected— reasonably or unreasonably' — of terrorist activity to countries, including Syria, where interrogations under torture are routine.” Compl. ¶ 24. Arar alleges on information and belief that the United States sends individuals “to countries like Syria precisely because those countries can and do use methods of interrogation to obtain information from detainees that would not be morally acceptable or legal in the United States and other democracies.” Id. The complaint further alleges that federal officials involved with extraordinary rendition “have facilitated such human rights abuses, exchanging dossiers with intelligence officials in the countries to which non-U.S. citizens are removed.” Id. The complaint also alleges that the United States involves Syria in its extraordinary rendition program to extract counter-terrorism information. (Arar, 414 F.Supp.2d at 256.)
This extraordinary rendition program is, Arar alleges, not part of any official or declared U.S. public policy; nevertheless, it has received extensive attention in the press, where unnamed U.S. officials and certain foreign officials have admitted to the existence of such a policy. Arar details a number of articles in the mainstream press recounting both the incidents of this particular case and the extraordinary rendition program more broadly. These articles are attached as Exhibit C of his complaint. (Id. at 256-57.)
Arar alleges that the defendants directed the interrogations in Syria by providing information about Arar to Syrian officials and receiving reports on Arar’s responses. Consequently, the defendants conspired with, and/or aided and abetted, Syrian officials in arbitrarily detaining, interrogating, and torturing Arar. Arar argues in the alternative that, at a minimum, the defendants knew or at least should have known that there was a substantial likelihood that he would be tortured upon his removal to Syria. (Id. at 257.)

E. Syria’s Human Rights Record

Arar’s claim that he faced a likelihood of torture in Syria is supported by U.S. State *589 Department reports on Syria’s human rights practices. See, e.g., Bureau of Democracy, Human Rights, and Labor, United States Department of State, 2004 Country Reports on Human Rights Practices (Released February 28, 2005) (“2004 Report”). According to the State Department, Syria’s “human rights record remained poor, and the Government continued to commit numerous, serious abuses ... including] the use of torture in detention, which at times resulted in death.” Id. at 1. Although the Syrian constitution officially prohibits such practices, “there was credible evidence that security forces continued to use torture frequently.” Id. at 2. The 2004 Report cites “numerous cases of security forces using torture on prisoners in custody.” Id. Similar references throughout the 2004 Report, as well as State Department reports from prior years, are legion. See, e.g., Compl. Ex. A (2002 State Department Human Rights Report on Syria). (Arar, 414 F.Supp.2d at 257.)[11]

F. The Canadian Government Inquiry

On September 18, 2006, a Commission of Inquiry into the Actions of Canadian Officials in Relation to Maher Arar (“Arar Commission”), established by the government of Canada to investigate the Arar affair, issued a three-volume report. See Arar Commission, Report of the Events Relating to Maher Arar (2006) (“Commission Report”).[12] A press release issued by the Commission summarized: “On Maher Arar the Commissioner [Dennis O’Connor] comes to one important conclusion: T am able to say categorically that there is no evidence to indicate that Mr. Arar has committed any offence or that his activities constitute a threat to the security of Canada.’ ” Arar Commission, Press Release, Arar Commission Releases Its Findings on the Handling of the Maher Arar Case (Sept. 18, 2006) (boldface in original), available at http://www.ararcommission.ca/ eng/Release Final — Sept 18.pdf (copy on file with the Clerk of Court). On January 26, 2007, the Office of the Prime Minister of Canada issued the following announcement:
Prime Minister Stephen Harper today released the letter of apology he has sent to Maher Arar and his family for any role Canadian officials may have played in what happened to Mr. Arar, Monia Mazigh and their family in 2002 and 2003.
“Although the events leading up to this terrible ordeal happened under the previous government, our Government will do everything in its power to ensure that the issues raised by Commissioner O’Connor are addressed,” said the Prime Minister. “I sincerely hope that these actions will help Mr. Arar and his family begin a new and hopeful chapter in their lives.”
Canada’s New Government has accepted all 23 recommendations made in Commissioner O’Connor’s first report, and has already begun acting upon them. The Government has sent letters to both the Syrian and the U.S. governments formally objecting to the treatment of Mr. Arar. Ministers Day and MacKay have also expressed Canada’s concerns on this important issue to their Ameri *590 can counterparts. Finally, Canada has removed Mr. Arar from Canadian lookout lists, and requested that the United States amend its own records accordingly-
The Prime Minister also announced that Canada’s New Government has successfully completed the mediation process with Mr. Arar, fulfilling another one of Commissioner O’Connor’s recommendations. This settlement, mutually agreed upon by all parties, ensures that Mr. Arar and his family will obtain fair compensation, in the amount of $10.5 million, plus legal costs, for the ordeal they have suffered.
Office of the Prime Minister, Press Release, Prime Minister Releases Letter of Apology to Maher Arar and His Family and Announces Completion of Mediation Process (Jan. 26, 2007), available at http:// pm.gc.ea/eng/media.asp?id=1509 (last visited July 15, 2009); see also Margaret L. Satterthwaite, Rendered Meaningless: Extraordinary Rendition and the Rule of Law, 75 Geo. Wash. L.Rev. 1333, 1339-40 (2007).
II. The Dismissal of the Fourth Claim for Relief
The fulcrum of the en banc majority’s analysis is its conclusion that this appeal requires us to decide whether “to devise a new Bivens damages action” under Wilkie v. Robbins, 551 U.S. 537, 127 S.Ct. 2588, 2597, 168 L.Ed.2d 389 (2007). See infra at 599. But the majority can characterize Arar’s action as “new” only by isolating and eliminating the domestic aspects of the case. It does so in part by affirming the district court’s dismissal of Arar’s “Fourth Claim for Relief, (Fifth Amendment: Substantive Due Process — Domestic Detention)” on the ground that the claim was insufficiently pleaded. See supra at 569. We think that ruling to be incorrect.
With respect to the conditions of confinement aspect of this claim, the district court concluded that Arar was entitled to Fifth Amendment substantive due process protection and that his rights in that respect could have been violated by “the deprivations Arar alleges with respect to his treatment while in U.S. custody.” Arar, 414 F.Supp.2d at 286. We agree, and the majority does not decide otherwise. Supra at 569. With respect to the access to counsel and the courts aspect of the claim, the district court concluded that Arar would be able to state a claim for interference “with his access to courts in part by [government officials] lying to his counsel,” if he could “identify ‘a separate and distinct right to seek judicial relief for some wrong.’ ” Arar, 414 F.Supp.2d at 285 (quoting Christopher v. Harbury, 536 U.S. 403, 414-15, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002)). We agree here, too, and the majority does not decide otherwise.
But the district court nonetheless dismissed the Fourth Claim for Relief without prejudice. On pain of forfeiture of the claims, it required Arar (1) with respect to the mistreatment claim, to “name those defendants that were personally involved in the alleged unconstitutional treatment,” and, (2) with respect to the denial of access claim, to replead “without regard to any [underlying] rendition claim,” in light of the court’s conclusion that no Bivens action was available with respect to such a claim, and, because it was unclear to what underlying relief Arar was denied access, “identifying] the specific injury he was prevented from grieving.” Arar, 414 F.Supp.2d at 287-88. Arar declined to replead,[13] rendering the dismissal final.

*591
A. Specification of Defendants’ Acts and Conspiracy Allegations

The majority affirms the dismissal of the Fourth Claim for Relief on the ground that Arar’s complaint does not “specify any culpable action taken by any single defendant” and fails to allege a conspiracy. Supra at 569. We disagree with each of these rationales.
Arar should not have been required to “name those defendants [who] were personally involved in the alleged unconstitutional treatment.” Arar, 414 F.Supp.2d at 287. In actions pursuant to 42 U.S.C. § 1983, which are “analogfs]” of the less-common Bivens action, Ashcroft v. Iqbal, — U.S. -, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (citation omitted), we allow plaintiffs to “maintain[ ] supervisory personnel as defendants ... until [they have] been afforded an opportunity through at least brief discovery to identify the subordinate officials who have personal liability.” Davis v. Kelly, 160 F.3d 917, 921 (2d Cir.1998) (citing Second Circuit authority).
Similarly, courts have rejected the dismissal of suits against unnamed defendants described by roles ... until the plaintiff has had some opportunity for discovery to learn the identities of responsible officials. Once the supervisory officer has inquired within the institution and identified the actual decision-makers of the challenged action, those officials may then submit affidavits based on their personal knowledge of the circumstances.
Id. (citations omitted). It should not be forgotten that the full name of the Bivens case itself is Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (emphasis added).[14]
To be sure, the Supreme Court has recently set a strict pleading standard for supervisory liability claims under Bivens against a former Attorney General of the United States and the Director of the FBI. See Iqbal, supra. We do not think, however, that the Court has thereby permitted governmental actors who are unnamed in a *592 complaint automatically to escape personal civil rights liability. A plaintiff must, after all, have some way to identify a defendant who anonymously violates his civil rights. We doubt that Iqbal requires a plaintiff to obtain his abusers’ business cards in order to state a civil rights claim. Put conversely, we do not think that Iqbal implies that federal government miscreants may avoid Bivens liability altogether through the simple expedient of wearing hoods while inflicting injury. Some manner of proceeding must be made available for the reasons we recognized in Davis.
Whether or not there is a mechanism available to identify the “Doe” defendants, moreover, Arar’s complaint does sufficiently name some individual defendants who personally took part in the alleged violation of his civil rights. The role of defendant J. Scott Blackman, formerly Director of the Regional Office of INS, for example, is, as reflected in the district court’s explication of the facts, see Arar, 414 F.Supp.2d at 252-54, set forth in reasonable detail in the complaint.[15] So are at least some of the acts of the defendant Edward J. McElroy, District Director of the INS.[16]
The majority also asserts that Arar does no more than “allege[] (in passive voice) that his requests to make phone calls “were ignored,’ and that ‘he was told’ that he was not entitled to a lawyer.” Supra at 569. But as indicated above, such an identification of the unnamed defendants by their “roles” should be sufficient to enable a plaintiff to survive a motion to dismiss, and subsequently to use discovery to identify them. And while the majority is correct that the complaint does not utter the talismanic words “meeting of the minds” to invoke an agreement among the defendants, see supra at 569, it is plain that the logistically complex concerted action allegedly taken to detain Arar and then transport him abroad implies an alleged agreement by government actors within the United States to act in concert.

B. Dismissal of Claims of Denial of Access to Courts and Counsel

With respect to the dismissal of Arar’s claim for “interfere[nee] with his access to lawyers and the courts” while he was incarcerated by United States officials, Compl. ¶ 93, we think the district court erred here, too. An access to courts claim requires the pleading of (1) a “nonfrivolous, arguable underlying claim” that has been frustrated by the defendants’ actions, and (2) a continued inability to obtain the relief sought by the underlying claim. Christopher, 536 U.S. at 415-16, 122 S.Ct. 2179 (internal quotation marks omitted). The district court decided that Arar failed *593 to plead with sufficient “precisfion]” the existence of a sought-for underlying claim for relief, Arar, 414 F.Supp.2d at 286, which means it decided that, for purposes of Federal Rule of Civil Procedure 8,[17] the defendants were not put on notice of the existence of such a claim. See Christopher, 536 U.S. at 416, 122 S.Ct. 2179 (“Like any other element of an access claim, the underlying cause of action and its lost remedy must be addressed by allegations ... sufficient to give fair notice to a defendant.”).
But taking the allegations in the complaint as true, as we must, the complaint clearly implies the existence of an underlying claim for relief under CAT. The defendants can hardly argue that under Arar’s assertions, which we take to be true, they lacked notice of such a claim, since the complaint says that it was they who first notified Arar about it: Arar alleges that on October 8, 2002, “two INS officials told him that ... Defendant Blackman ... had decided to remove [him] to Syria,” and “Defendant Blackman also stipulated that [such action] would be consistent with Article 3 of CAT.” Compl. ¶ 47. Indeed, the complaint alleges that Arar asked defendants for reconsideration of that decision — i.e., relief from it — in light of the prospect of torture in Syria, but the officials said that “the INS is not governed by the ‘Geneva Conventions.’ ” Id.
Insofar as the district court’s requirement that Arar “articulate more precisely the judicial relief he was denied,” Arar, 414 F.Supp.2d at 286, related to its holding that “Bivens did not extend a remedy to Arar for his deportation to Syria,” id., we disagree for the reasons set forth below. Insofar as the district court thought Arar’s underlying CAT claim would have been frivolous, it was mistaken. Cf. Ramsameachire v. Ashcroft, 357 F.3d 169, 184 (2d Cir.2004) (pursuant to the CAT, the United States may not remove an alien to a country if “ ‘it is more likely than not that he or she would be tortured if removed to [that country]’ ” (quoting 8 C.F.R. § 208.16(c)(2))).
Nor was CAT the only relief Arar was denied. As the government pointed out at oral argument, “th[e] decision [in Michael v. INS, 48 F.3d 657 (2d Cir.1995),] shows that in extraordinary cases, and no one can dispute that this is an extraordinary case, the plaintiff could have filed a habeas [petition] and sought a stay pursuant to the All Writs Act.” Tr. at 82 (Cohn).[18]
Contrary to the district court’s ruling, then, Arar’s complaint put the defendants on notice of claims seeking relief to bar his removal that were frustrated by the defendants’ actions. Whatever the ultimate merits of those claims, they would not have been “frivolous.” And absent a remedy for the rendition and torture themselves— the district court, and the majority, of *594 course, conclude there is none — no contemporaneous legal relief is now possible except through the access to courts and counsel claim. See generally Br. of Amici Norman Dorsen et al. at 12-14. The Fourth Claim for Relief therefore states a sufficient due process access claim.
C. Sufficient Pleading under Iqbal
More generally, we think the district court’s extended recitation of the allegations in the complaint makes clear that the facts of Arar’s mistreatment while within the United States — including the alleged denial of his access to courts and counsel and his alleged mistreatment while in federal detention in the United States — were pleaded meticulously and in copious detail. The assertion of relevant places, times, and events — and names when known — is lengthy and specific. Even measured in light of Supreme Court case law postdating the district court’s dismissal of the fourth claim, which instituted a more stringent standard of review for pleadings, the complaint here passes muster. It does not “offer[ ] ‘labels and conclusions’ or ‘a formulaic recitation of the elements of a cause of action.’ ” Iqbal, 129 S.Ct. at 1949 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Nor does it “tender[ ] ‘naked assertion[s]’ devoid of ‘further factual enhancement.’ ” Id. (quoting Twombly, 550 U.S. at 557, 127 S.Ct. 1955). Its allegations of a constitutional violation are “ ‘plausible on [their] face.’ ” Id. (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955). And, as we have explained, Arar has pled “factual content that allows the court to draw the reasonable inference that the defendant[s][are] liable for the misconduct alleged.” Id. (quoting Twombly, 550 U.S. at 556, 127 S.Ct. 1955). We would therefore vacate the district court’s dismissal of the Fourth Claim for Relief.
III. The Majority’s Interpretation of the Second and Third Claims for Relief
Having thus decided, mistakenly we think, that Arar’s Fourth Claim for Relief has failed, our colleagues leap to the conclusion that what remains — the allegations contained in what Arar’s complaint styles as the Second and Third Claims for Relief — relates only to the legal implications of the international and foreign elements of the defendants’ behavior. See supra at 569-70 (“Arar’s remaining claims seek relief on the basis of torture and detention in Syria....”). Even were we to agree with the majority’s view that the Fourth Claim for Relief warranted dismissal, we would still not concur in its crabbed interpretation of Arar’s complaint in light of the facts alleged in it.
“[W]e may not affirm the dismissal of [a] complaint because [it has] proceeded under the wrong theory ‘so long as [it has] alleged facts sufficient to support a meritorious legal claim.’ ” Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 89 (2d Cir.2000) (plurality opinion of Pooler, J.) (quoting Northrop v. Hoffman of Simsbury, Inc., 134 F.3d 41, 46 (2d Cir.1997)), cert. denied, 534 U.S. 888, 122 S.Ct. 201, 151 L.Ed.2d 142 (2001). “ ‘Factual allegations alone are what matter[ ].’ ” Northrop, 134 F.3d at 46 (quoting Albert v. Carovano, 851 F.2d 561, 571 n. 3 (2d Cir.1988) (en banc)); see also Newman v. Silver, 713 F.2d 14, 15 n. 1 (2d Cir.1983) (“[T]he nature of federal pleading ... is by statement of claim, not by legal theories.”).[19] *595 And we are required to read those factual allegations as a whole. See Shapiro v. Cantor, 128 F.3d 717, 721 (2d Cir.1997); see also Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1252 n. 11 (11th Cir.2005) (per curiam), cert. denied, 549 U.S. 1032, 127 S.Ct. 596, 166 L.Ed.2d 431 (2006); Goldwasser v. Ameritech Corp., 222 F.3d 390, 401 (7th Cir.2000).
Although Arar pled in his Fourth Claim for Relief what he denominated as a separate “Claim” on the subject of “Domestic Detention,” including allegations about unconstitutional conditions of confinement and denial of access to courts and counsel, the complaint as a whole makes broader allegations of mistreatment while within the borders of the United States. According to the complaint: (1) Arar was apprehended by government agents as he sought to change planes at JFK; (2) he was not seeking to enter the United States; (3) his detention was for the purpose of obtaining information from him about terrorism and his alleged links with terrorists and terrorist organizations; (4) he was interrogated harshly on that topic — mostly by FBI agents — for many hours over a period of two days; (5) during that period, he was held incommunicado and was mistreated by, among other things, being deprived of food and water for a substantial portion of his time in custody; (6) he was then taken from JFK to the MDC in Brooklyn, where he continued to be held incommunicado and in solitary confinement for another three days; (7) while at the MDC, INS agents sought unsuccessfully to have him agree to be removed to Syria because they and other U.S. government agents intended that he would be questioned there along similar lines, but under torture; (8) U.S. officials thwarted his ability to consult with counsel or access the courts; and (9) thirteen days after Arar had been intercepted and incarcerated at the airport, defendants sent him against his will to Syria, where they allegedly intended that he be questioned under torture and while enduring brutal and inhumane conditions of captivity. This was, as alleged, all part of a single course of action conceived of and executed by the defendants in the United States in order to try to make Arar “talk.”
It may not have been best for Arar to file a complaint that structures his claims for relief so as to charge knowing or reckless subjection to torture, coercive interrogation, and arbitrary detention in Syria (the second and third claims) separately from charges of cruel and inhuman conditions of confinement and “interfere[nce] ■with access to lawyers and the courts” while in the United States (the fourth claim). But such division of theories is of no legal consequence. “ ‘Factual allegations alone are what matter[ ].’ ” Northrop, 134 F.3d at 46 (quoting Albert, 851 F.2d at 571 n. 3). The assessment of Arar’s complaint must, then, take into account the entire arc of factual allegations that it contains — his interception and arrest; his interrogation, principally by FBI agents, about his putative ties to terrorists; his detention and mistreatment at JFK in Queens and the MDC in Brooklyn; the deliberate misleading of both his lawyer and the Canadian Consulate; and his transport to Washington, D.C. and forced transfer to Syrian authorities for further detention and questioning under torture. Such attention to the complaint’s factual *596 allegations, rather than its legal theories, makes perfectly clear that the remaining claims upon which Arar seeks relief are not limited to his “detention or torture in Syria,” supra at 584, but include allegations of violations of his due process rights in the United States. The scope of those claims is relevant in analyzing whether a Bivens remedy is available.
IV. The “Context” in Which a Bivens Remedy Is Sought
The majority’s artificial interpretation of the complaint permits it to characterize the “context” of Arar’s Bivens action as entirely one of “international rendition, specifically, ‘extraordinary rendition.’ ” Supra at 572; see also id. (“Extraordinary rendition is treated as a distinct phenomenon in international law.”). This permits the majority to focus on the part of the complaint that presents a “new context” for Bivens purposes. But when the complaint is considered in light of all of Arar’s allegations, his due process claim for relief from his apprehension, detention, interrogation, and denial of access to counsel and courts in the United States, as well as his expulsion to Syria for further interrogation likely under torture, is not at all “new.”
A. Bivens and Its Progeny
In Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Supreme Court “recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen’s constitutional rights.” Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 66, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001). Bivens permitted “a victim of a Fourth Amendment violation by federal officers [to] bring suit for money damages against the officers in federal court.” Id. The Supreme Court has been reluctant, as the majority correctly observes, to “extend” Bivens liability further. See, e.g., Wilkie, 127 S.Ct. at 2597. The Court has done so only twice — in the contexts of “an implied damages remedy under the Due Process Clause of the Fifth Amendment” in Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), and under “the Cruel and Unusual Punishments Clause of the Eighth Amendment” in Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). Malesko, 534 U.S. at 67, 122 S.Ct. 515; see also Wilkie, 127 S.Ct. at 2597-98. But we must ask whether we should “devise a new Bivens damages action,” Wilkie, 127 S.Ct. at 2597, only if the asserted action is, indeed, new. And a new Bivens action is not being sought unless the plaintiff is asking the court to “extend Bivens liability to a[ ] new context or new category of defendants.” Malesko, 534 U.S. at 68, 122 S.Ct. 515.

B. The New Category of Defendants Test

The majority does not suggest that Arar’s Bivens claim fails because it is against a new category of defendants. The Bivens remedy was devised to supply relief for constitutional torts by federal agents and officials. See Malesko, 534 U.S. at 70, 122 S.Ct. 515.

C. The New Context Test

The questions, then, are whether we are facing a “new context,” or considering recognizing “a new Bivens damages action,” questions that are complicated by the fact that the meaning that the Supreme Court has ascribed to those terms is less than clear. Compare Malesko, 534 U.S. at 67, 122 S.Ct. 515 (noting that Bivens was extended to “a new right of action” in Davis v. Passman, in which the Court “recognized an implied damages remedy under the Due Process Clause of the Fifth Amendment ” (emphasis added)), *597 with id. at 68, 122 S.Ct. 515 (describing Schweiker v. Chilicky, 487 U.S. 412, 108 S.Ct. 2460, 101 L.Ed.2d 370 (1988), as presenting a “new context[]” in which the plaintiffs sought damages under the Due Process Clause for errors made by federal officials “in the[] handling of [their] Social Security applications ” (emphasis added)).
If the alleged facts of Arar’s complaint were limited to his claim of “extraordinary rendition” to, and torture in, Syria — that is, limited to his allegations that he was transported by the United States government to Syria via Jordan pursuant to a conspiracy or other arrangement among the countries or their agents and mistreated in Syria as a result — as the majority would have it, then we might well agree that we are dealing with a “new context.” But, as we have explained, the complaint is not so limited. Incarceration in the United States without cause, mistreatment while so incarcerated, denial of access to counsel and the courts while so incarcerated, and the facilitation of torture by others, considered as possible violations of a plaintiffs procedural and substantive due process rights, are hardly novel claims, nor do they present us with a “new context” in any legally significant sense.[20]
We have recognized implied Bivens rights of action pursuant to the Due Process Clause, so Arar’s claims for relief are not new actions under Bivens in that sense. A deprivation of procedural due process rights can give rise to a Bivens claim under our case law. See, e.g., Tellier v. Fields, 280 F.3d 69, 80-83 (2d Cir.2000). And while we do not appear to have squarely considered whether a Bivens action may lie for alleged violations of substantive due process rights, our cases imply that it can be. In Iqbal v. Hasty, 490 F.3d 143 (2d Cir.2007), rev’d in part on other grounds sub nom Ashcroft v. Iqbal, — U.S. -, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), for example, we considered a Bivens action brought on, inter alia, a Fifth Amendment substantive due process theory. The plaintiff alleged physical mistreatment and humiliation, as a Muslim prisoner, by federal prison officials, while he was detained at the MDC. After concluding, on interlocutory appeal, that the defendants were not entitled to qualified immunity, we returned the matter to the district court for further proceedings. We did not so much as hint either that a Bivens remedy was unavailable or that its availability would constitute an unwarranted extension of the Bivens doctrine.[21] Iqbal, 490 F.3d at 177-78.
*598 In other cases we have apparently assumed Bivens remedies were available for substantive due process claims. See Thomas v. Ashcroft, 470 F.3d 491, 497 (2d Cir.2006) (reversing district court’s dismissal of Bivens action for violation of plaintiffs Fifth Amendment substantive due process rights while detained at the MDC); Cuoco v. Moritsugu, 222 F.3d 99 (2d Cir.2000) (dismissing, on qualified immunity grounds, plaintiffs Bivens claim for, inter alia, substantive due process violations, without questioning whether a cause of action was available); Li v. Canarozzi, 142 F.3d 83 (2d Cir.1998) (affirming judgment following jury verdict for defendants in Bivens action based on allegations of physical assault by guards at the federal Metropolitan Correctional Center in New York City, although not explicitly on substantive due process grounds); Ayeni v. Mottola, 35 F.3d 680, 691 (2d Cir.1994) (apparently assuming that Bivens remedy was available for substantive due process claim, but deciding that it could not be pursued because the claim in issue was covered by the more particular provisions of the Fourth Amendment, for which a Bivens action was permitted), abrogated on qualified immunity grounds, Wilson v. Layne, 526 U.S. 603, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999).
Indeed, even the most “international” of Arar’s domestic allegations — that the defendants, acting within the United States, sent Arar to Syria with the intent that he be tortured — present no new context for Bivens purposes. Principles of substantive due process apply to a narrow band of extreme misbehavior by government agents acting under color of law: mistreatment that is “so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.” Lombardi v. Whitman, 485 F.3d 73, 79 (2d Cir.2007) (internal quotation marks omitted). Sending Arar from the United States with the intent or understanding that he will be tortured in Syria easily exceeds the level of outrageousness needed to make out a substantive due process claim.
Although the “shocks the conscience” test is undeniably “vague,” see Estate of Smith v. Marasco, 430 F.3d 140, 156 (3d Cir.2005); Schaefer v. Goch, 153 F.3d 793, 798 (7th Cir.1998), “[n]o one doubts that under Supreme Court precedent, interrogation by torture” meets that test, Harbury v. Deutch, 233 F.3d 596, 602 (D.C.Cir.2000), rev’d on other grounds sub nom Christopher v. Harbury, 536 U.S. 403, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002);[22] see also Rochin v. California, 342 U.S. 165, 172, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (holding that the forcible pumping of a suspect’s stomach to obtain evidence to be used against him was “too close to the rack and the screw to permit of constitutional differentiation”); Palko v. Connecticut, 302 U.S. 319, 326, 58 S.Ct. 149, 82 L.Ed. 288 (1937) (noting that the Due Process Clause must at least “give protection against torture, physical or mental”), over *599 ruled on other grounds, Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); Brown v. Mississippi 297 U.S. 278, 285-86, 56 S.Ct. 461, 80 L.Ed. 682 (1936) (“Because a state may dispense with a jury trial, it does not follow that it may substitute trial by ordeal. The rack and torture chamber may not be substituted for the witness stand.”).[23]
To be sure, Arar alleges not that the defendants themselves tortured him; he says that they “outsourced” it.[24] But we do not think that the question whether the defendants violated Arar’s substantive due process rights turns on whom they selected to do the torturing,[25] or that such “outsourcing” somehow changes the essential character of the acts within the United States to which Arar seeks to hold the defendants accountable.
We think that Arar states a substantive due process claim under either of two theories of substantive due process liability: “special relationship liability” or “stateereated-danger liability,” Benzman v. Whitman, 523 F.3d 119, 127 (2d Cir.2008) (internal quotation marks omitted). Under the latter doctrine, the defendants can be held liable for “tak[ing] an affirmative act that creates an opportunity for a third party to harm a victim (or increases the risk of such harm).” Lombardi, 485 F.3d at 80. Under the former, Arar was owed “an affirmative duty” by the defendants to protect him from harm by Syrian agents in light of the fact that the government took him “into its custody and h[eld] him there against his will.” Matican v. City of New York, 524 F.3d 151, 155-56 (2d Cir.) (citations, internal quotation marks, and footnotes omitted), cert. denied, — U.S. -, 129 S.Ct. 636, 172 L.Ed.2d 611 (2008).
In sum, we do not view the current action as presenting a “new context” in any relevant sense. We therefore do not think we must decide whether “to devise a new Bivens damages action.” Wilkie, 127 S.Ct. at 2597, here.
V. Devising a New Bivens Damages Action
Even apart from our disagreement with the majority that Arar’s claims present a new context in which to extend Bivens liability, we are puzzled by the majority’s analysis as to whether to do so. Having decided that the issue for our consideration is whether a Bivens action should be *600 permitted in what it has concluded is a new context, the majority engages in a two-part inquiry: “whether there is an alternative remedial scheme available to the plaintiff; and whether ‘special factors counsel! ] hesitation’ in creating a Bivens remedy.” Supra at 572 (quoting Wilkie, 127 S.Ct. at 2598).
Our colleagues wisely decline to decide the first issue, whether an alternative remedial scheme is available, partly because they conclude that this is not an immigration case (or, at least, not a “typical” one), see supra at 570, and partly because “Arar has alleged that he was actively prevented from seeking any meaningful review and relief through the INA processes,” supra at 573; see also supra at 570-71. This is significant inasmuch as the Supreme Court has observed that it has recognized “new” Bivens actions precisely, inter alia, “to provide a cause of action for a plaintiff who lacked any alternative remedy for harms caused by an individual officer’s unconstitutional conduct.” Malesko, 534 U.S. at 70, 122 S.Ct. 515 (emphasis omitted).
The majority moves on to the second prong of the test, concluding that “special factors are clearly present in the new context of this case, and they sternly counsel hesitation.” Supra at 573. We think it unfortunate that the majority concludes that Arar should be afforded no Bivens right of action in light of such “special factors.” We quarrel not only with their conclusion, but also the majority’s apparent treatment of the existence vel non of “special factors counseling hesitation” as the determinative legal standard for whether an extension of Bivens is warranted. Setting aside for the moment our view that many of the “special factors” cited by the majority are not properly considered to be such, we think it mistaken to preclude Bivens relief solely in light of a citation or compilation of one or more purported examples of such “special factors.”
“A Special Factors” As a Standard
The majority is not altogether clear in conveying its understanding of the legal significance of a finding that “special factors counseling hesitation,” “sternly” or otherwise, are present. The majority acknowledges that “[hjesitation is a pause, not a full stop, or an abstention; and to counsel is not to require,” supra at 574, but it also states that countervailing factors are not considered, and that no such factors have “ever been cited by the Supreme Court as a reason for affording a Bivens remedy where it would not otherwise exist,” id. What we are left with is an implication that the presence of “special factors counseling hesitation” in fact does require a “full stop, or an abstention.” We disagree. It seems to us that the existence of such “special factors” alone does not compel a conclusion that a Bivens action is unavailable.
When the words “special factors counseling hesitation” were first uttered by the Supreme Court, in Bivens itself, the Court asserted that there is a general rule “that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.” Bivens, 403 U.S. at 396, 91 S.Ct. 1999 (internal quotation marks omitted). The Court then said: “The present case involves no special factors counseling hesitation in the absence of affirmative action by Congress,” citing cases in which the general rule had not been applied.[26] Id. The Bivens Court’s *601 observation that there was no cause for hesitation, and its simultaneous recognition in the case before it of a private right of action did not imply, however — -as the majority seems to — that if there had been reason to hesitate, then the Court, ipso facto, would not have recognized a right of action.[27]
The Supreme Court has not told us that “special factors counseling hesitation” are to be understood to prohibit a private right of action. In Wilkie, for example, the Court noted that deciding “whether to recognize a Bivens remedy may require two steps,” the second of which asks that the court “pay[] particular heed ... to any special factors counselling hesitation,” id., 127 S.Ct. at 2598 (emphasis added). And the Court, in Bush v. Lucas, 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), relied upon by the Wilkie Court in this regard, similarly observed that “[i]n the absence of ... a congressional directive [that a right of action lies], the federal courts must make the kind of remedial determination that is appropriate for a common-law tribunal, paying particular heed, however, to any special factors counseling hesitation before authorizing a new kind of federal litigation.” Id. at 378, 103 S.Ct. 2404 (emphasis added).
“[H]eed” means “[c]lose attention” or “notice.” American Heritage Dictionary of the English Language 813 (4th ed. 2000). To “pay heed,” then, means “to notice,” it does not mean “to be governed by.” The majority tells us that “ ‘[h]esitation’ is ‘counseled’ whenever thoughtful discretion would pause even to consider.” Supra at 574. If the existence of “special factors counseling hesitation” were determinative of the existence of a right of action, the bar to declining to allow a new Bivens claim would be less than “remarkably low.” Id. It would be chimerical.
It is difficult to deny the existence of “special factors counseling hesitation” in this case. We have been “hesitating” — in order to deliberate in light of those factors — for nearly two years. While the time we have taken to consider “special factors” strongly indicates that they counsel hesitation, it cannot follow that having hesitated, we must therefore halt, and dismiss the Bivens complaint.[28]

B. The Special Factors Identified by the Majority

The “special factors” cited by the majority fall into one of two general categories: those involving security, secrecy, and con *602 fidentiality, and those involving other policy considerations. We turn to the latter category first, briefly summarizing each factor as the majority describes it and then setting forth our view of the factor’s weight.

1. Factors not involving secrecy or security.

• This action asks for damages, but it functionally “operates as a constitutional challenge to the policies promulgated by the executive.” Supra at 574. We should hesitate to allow such an action to proceed because to do so would tacitly “decide,” id., that Bivens can subject federal officers to the kind of enterprise liability that was established for actions under 42 U.S.C. § 1983 by Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), but has not been established for Bivens actions.
This paraphrase sets forth the strongest argument (“factor”), we think, for denying a Bivens remedy to Arar. After Iqbal, it would be difficult to argue that Arar’s complaint can survive as against defendants who are alleged to have been supervisors with, at most, “knowledge” of Arar’s mistreatment. See Iqbal, 129 S.Ct. at 1949; see also id. at 1955 (Souter, J., dissenting). And to the extent that the United States remains a defendant, perhaps it should be dismissed for want of possible liability under Bivens too. But that does not dispose of the case against the lower-level defendants, such as Black-man, McElroy, and the Doe defendants, who are alleged to have personally undertaken purposeful unconstitutional actions against Arar.
It also may be that to the extent actions against “policymakers” can be equated with lawsuits against policies, they may not survive Iqbal either. But while those championing Arar’s case may in fact wish to challenge extraordinary rendition policy writ large, the relief Arar himself seeks is principally compensation for an unconstitutional implementation of that policy. That is what Bivens actions are for.
• Actions for damages against federal officers “who implement” rendition “policy” implicate sovereign immunity concerns, by “influencing] government policy, prob[ing] government secrets, invad[ing] government interests, enmeshing] government lawyers, and ... eliciting] government funds for settlement.” Supra at 574.
• Recognizing a Bivens action for Arar would entail a judicial “assessment of the validity and rationale” of rendition, which “directly affectfs] significant diplomatic and national security concerns.” Supra at 575. The concern here is in part one of separation of powers, see supra at 575, and in part one of institutional incompetence, see supra at 575.
Aside from diplomatic and national security considerations, which we address below, this consideration applies to all civil rights actions. Bivens by its nature implicates “government interests,” enmeshes government lawyers, and elicits government funds for settlement. Bivens by its nature authorizes courts to invalidate exercises in executive power. A Bivens action, like any other civil rights action, is an attempt to hold members of the executive accountable for their allegedly unconstitutional acts, through the courts. If these “special factors” were persuasive grounds on which to deny Bivens actions, they would not only not be permitted in new contexts, they would not be permitted at all.
Similarly, insofar as this Bivens action may influence executive policy, we doubt *603 that that should be a factor “counseling hesitation” either. Civil rights actions influence policy: They make it more costly for executive officers to violate the Constitution. That is their point. See Wyatt v. Cole, 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992) (“The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.”).
Finally, the majority suggests that “[i]n the small number of contexts in which courts have implied a Bivens remedy, it has often been easy to identify both the line between constitutional and unconstitutional conduct, and the alternative course which officers should have pursued,” a “distinction [the majority says] may or may not amount to a special factor counseling hesitation in the implication of a Bivens remedy.” Supra at 580. It should be noted to the contrary that in the two Supreme Court decisions that did “extend” a Bivens remedy in a “new context,” such identification was anything but “easy.” Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), involved the line between constitutional and unconstitutional medical treatment and medical facilities in prisons, whose management the Supreme Court has found “peculiarly within the province and professional expertise of corrections officials” — and thus outside of the competence of judges — and instructed courts to “ordinarily defer to [prison officials’] expert judgment,” Pell v. Procunier, 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). And Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), addressed the line between constitutional and unconstitutional discrimination in public employment, which the Court later observed raises issues requiring “decisions [that] are quite often subjective and individualized, resting on a wide array of factors that are difficult to articulate and quantify,” Engquist v. Or. Dep’t of Agric., — U.S. -, 128 S.Ct. 2146, 2154, 170 L.Ed.2d 975 (2008).
The factors relied upon by the majority that do not relate to secrecy or security therefore do not appear to us to counsel strongly against recognition of a Bivens remedy here.
2. Factors involving secrecy or security. The other “special factors” cited by the majority focus our attention on the ability of the executive to conduct the business of diplomacy and government in secret as necessary and to protect public and private security. It is beyond dispute that the judiciary must protect that concern. See, e.g., Doe v. CIA, 576 F.3d 95 (2d Cir.2009). But inasmuch as there are established procedures for doing just that, we think treating that need as giving rise to “special factors counseling hesitation” is an unfortunate form of double counting. The problem can be, should be, and customarily is, dealt with case by case by employing the established procedures of the state-secrets doctrine, see id.', see also section VI, below, rather than by barring all such plaintiffs at the courtroom door without further inquiry.
C. Factors Weighing in Favor of a Bivens Action
At least some factors weigh in favor of permitting a Bivens action in this case. We assume, as we are required to, that Arar suffered a grievous infringement of his constitutional rights by one or more of the defendants, from his interception and detention while changing planes at an international airport to the time two weeks *604 later when he was sent off in the expectation — perhaps the intent and expectation— that he would be tortured, all in order to obtain information from him. Breach of a constitutional or legal duty would appear to counsel in favor of some sort of opportunity for the victim to obtain a remedy for it. Justice Harlan’s landmark concurrence in Bivens explains:
Thefgovernment’s] arguments for a more stringent test to govern the grant of damages in constitutional cases [than that governing a grant of equitable relief] seem to be adequately answered by the point that the judiciary has a particular responsibility to assure the vindication of constitutional interests____To be sure, “it must be remembered that legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.” But it must also be recognized that the Bill of Rights is particularly intended to vindicate the interests of the individual in the face of the popular will as expressed in legislative majorities; at the very least, it strikes me as no more appropriate to await express congressional authorization of traditional judicial relief with regard to [the plaintiffs constitutional] legal interests than with respect to interests protected by federal statutes.
Bivens, 403 U.S. at 407, 91 S.Ct. 1999 (Harlan, J., concurring) (citation and footnote omitted).
And more generally, Bivens should be available to vindicate Fifth Amendment substantive due process rights such as those asserted here. As Judge Posner wrote for the Seventh Circuit with respect to a Bivens action:
[I]f ever there were a strong case for “substantive due process,” it would be a case in which a person who had been arrested but not charged or convicted was brutalized while in custody. If the wanton or malicious infliction of severe pain or suffering upon a person being arrested violates the Fourth Amendment — as no one doubts — and if the wanton or malicious infliction of severe pain or suffering upon a prison inmate violates the Eighth Amendment — as no one doubts — it would be surprising if the wanton or malicious infliction of severe pain or suffering upon a person confined following his arrest but not yet charged or convicted were thought consistent with due process.
Wilkins v. May, 872 F.2d 190, 194 (7th Cir.1989), cert. denied, 493 U.S. 1026, 110 S.Ct. 733, 107 L.Ed.2d 752 (1990);[29] accord Magluta v. Samples, 375 F.3d 1269 (11th Cir.2004) (reversing district court’s dismissal of pretrial detainee’s Bivens action alleging unconstitutional conditions of confinement at federal penitentiary in violation of the Due Process Clause of the Fifth Amendment); Cale v. Johnson, 861 F.2d 943, 946-47 (6th Cir.1988) (concluding that “federal courts have the jurisdictional authority to entertain a Bivens action brought by a federal prisoner, alleging violations of his right to substantive due process”), abrogated on other grounds, Thaddeus-X v. Blatter, 175 F.3d 378, 387-88 (6th Cir.1999); see also Sell v. United States, 539 U.S. 166, 193, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003) (Scalia, J., dissenting) (observing that “a [Bivens] action ... is available to federal pretrial detainees challenging the conditions of their confine *605 ment”) (citing Lyons v. U.S. Marshals, 840 F.2d 202 (3d Cir.1988)).[30]
A federal inmate serving a prison sentence can employ Bivens to seek damages resulting from mistreatment by prison officials. Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). It would be odd if a federal detainee not charged with or convicted of any offense could not bring an analogous claim.[31]
Finally, a factor counseling recognition of a Bivens action is that Arar has no other remedy for the alleged harms the defendant officers inflicted on him. Cf. Malesko, 534 U.S. at 70, 122 S.Ct. 515 (“In 30 years of Bivens jurisprudence we have extended its holding only twice, to provide an otherwise nonexistent cause of action against individual officers alleged to have acted unconstitutionally, or to provide a cause of action for a plaintiff who lacked any alternative remedy for harms caused by an individual officer’s unconstitutional conduct.”).
VI. The State-Secrets Privilege

A. Resolution on State-Secrets Grounds

If we have not been fully persuasive in arguing that a Bivens remedy should not be denied in this case, we hope we have made it abundantly clear that the question is a complex and difficult one. And that underlies our principal cause for dissent. We think it improper for the Court to take the twisting road to a categorical conclusion that no plaintiff has a private right of action in these circumstances and circumstances like them, when, by a brief order, we could take steps that would likely permit the case to be resolved on its particular facts without new and strained declarations of law.
The majority makes a thinly veiled reference to the recognition of a Bivens action as “alacrity or activism.” Supra, at 574. The irony of its making that assertion while reaching out unnecessarily to decide a difficult issue related to separation of powers principles should not be lost. Activism in the defense of “liberty,” we gather, is no vice.
“The state secrets privilege is a common law evidentiary rule that allows the government to withhold information from discovery when disclosure would be inimical to national security.” Zuckerbraun v. Gen. Dynamics Corp., 935 F.2d 544, 546 (2d Cir.1991). “In some cases, the effect of an invocation of the privilege may be so drastic as to require dismissal,” as when a “proper assertion of the privilege precludes access to evidence necessary for the plaintiff to state a prima facie claim.” Id. at 547. We share .what we think to be the majority’s intuition that this case would likely turn largely, if not entirely, on decisions of national security and diplomacy that the executive branch has already assured us it has good reason to keep out of public view.
*606 Indeed, the government, while arguing before us en bane seeking affirmance on the Bivens issue, could hardly have been clearer:
[I]t seems like at the core of your concerns and perhaps your colleagues’ concerns is you don’t have more information. And that might be the result of the fact that the district court did not rule on the state secrets issue, so all the classified declarations are not in the record, and if this court felt it could not address our Bivens special factors argument at this stage, and I think it can ... then I respectfully suggest this court do a limited remand for the district court to review the state secrets issue. The government would have to update the declarations, because much time has passed, but allow the government to do that, have the district court rule on the state secrets issues and then this Court could have this declaration before it if it thought it needed to do that.
Tr. 58-59 (Cohn). And:
Your Honor, if this Court is talking simply about a limited remand, to send this case back simply for the limited purpose of the district court examining the state secrets issue first [if the court won’t address Bivens otherwise], I think there’s a lot of sense to that, your Hon- or.
Id. at 62-63 (Cohn).
Recognizing that the government, like Arar and his counsel, would prefer a ruling on the merits, we nonetheless think we should be taking the government up on its alternate suggestion. Doing so would likely allow us to avoid giving sweeping answers to difficult questions of law that we are not required to ask. And it would, by well-established procedure, address what the majority cites as additional “special factors counseling hesitation” in recognizing a Bivens right of action.
• In particular, the majority notes these “factors”: Judicial consideration of the issues relating to rendition involves particular “sensitivities” because of the need to discover much “classified material,” supra at 576, including those relating to “the national security apparatus of at least three foreign countries, as well as that of the United States,” supra at 576.
• “Cases in the context of extraordinary rendition are very likely to present serious questions relating to private diplomatic assurances from foreign countries ..., and this feature of such claims opens the door to graymail.” Supra at 578; see also supra at 579 (“The risk of graymail is itself a special factor which counsels hesitation in creating a Bivens remedy.”).
These are “factors” that the state-secrets privilege was designed to address.[32]
We are not without precedent here— similar both factually and procedurally. In El-Masri v. United States, 479 F.3d 296 (4th Cir.), cert. denied, 552 U.S. 947, 128 S.Ct. 373, 169 L.Ed.2d 258 (2007), the issue was an alleged “special rendition” by U.S. agents of a German citizen from Macedonia to a U.S.-controlled prison in Afghanistan for the purpose of abusive interrogation. The plaintiff had brought suit, inter alia, pursuant to Bivens, for violation of his due process rights against former CIA director George Tenet, among others. The Fourth Circuit explained:
*607 The United States intervened as a defendant in the district court, asserting that El-Masri’s civil action could not proceed because it posed an unreasonable risk that privileged state secrets would be disclosed. By its Order of May 12, 2006, the district court agreed with the position of the United States and dismissed El-Masri’s Complaint.
Id. at 299-300. The district court, in summarizing its order, had said, “It is important to emphasize that the result reached here is required by settled, controlling law.”[33] El-Masri v. Tenet, 437 F.Supp.2d 530, 540 (E.D.Va.2006). The Fourth Circuit agreed and affirmed. El-Masri, 479 F.3d at 300.[34]
The majority cites the possibility of “graymail” as a “special factor counseling hesitation.” But as another decision of the Fourth Circuit points out, the state-secrets privilege protects this interest too, by “provid[ing] a necessary safeguard against litigants presenting the government with a Hobson’s choice between settling for inflated sums or jeopardizing national security.” Sterling v. Tenet, 416 F.3d 338, 344 (4th Cir.2005).[35]
In Arar’s case, the government followed essentially the same procedure as it had in El-Masri. The district court here (prior to the district court and court of appeals decisions in El-Masri) decided the case on Bivens grounds instead. We think that to have been mistaken.

B. Shortcomings of a State-Secrets Resolution

We discussed the state secrets doctrine in some detail in Doe, 576 F.3d at 101-05 (describing, inter alia, the emergence of the doctrine in and after United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953)). We are not oblivious to the criticism to which it has been subject. There has been considerable debate about it, see, e.g., Robert M. Chesney, Enemy Combatants After Hamdan v. Rumsfeld: State Secrets and the Limits of National Security Litigation, 75 Geo. Wash. L.Rev. 1249, 1263-1308 (2007) (“Enemy Combatants ”); Carrie Johnson, “Handling of ‘State Secrets’ At Issue,” Washington Post, Mar. 25, 2009, at Al, which has been stoked by the recent surfacing of the now-declassified Air Force accident report that *608 was the subject of Reynolds, see Barry Siegel, Claim of Privilege 205-10 (2008).[36]
But this controversy has centered on the extent of the judiciary’s role in making the determination of the legitimacy of the claim of privilege and the consequences of the government’s refusal to produce subpoenaed material necessary to the prosecution of the plaintiffs claim. See, e.g., Enemy Combatants, 75 Geo. Wash. L.Rev. at 1288.[37] No one can seriously doubt the need for a mechanism by which the government can effectively protect its legitimate military and diplomatic secrets. The question is whether those procedures now in place best balance the need for secrecy with competing values and interests. The critics do not, we think, seek to avoid at all cost and in all circumstances the ability of the government to protect state-secrets in civil litigation or the possibility that some such litigation will ultimately be resolved as a result.

C. The Majority’s Objections

The majority has two objections to a state-secrets resolution.
First, it hints that we have an “unflagging” obligation to address the Bivens issue before turning to the question of state secrets. See swpra at 575-76 (“True, courts can — with difficulty and resourcefulness — consider state secrets and even reexamine judgments made in the foreign affairs context when we must, that is, when there is an unflagging duty to exercise our jurisdiction.” (emphasis in original)). We highly doubt the jurisprudential necessity of addressing a broader, more difficult Bivens question when this case *609 might be resolved on its facts by application of well-established state-secrets procedures. As the panel majority pointed out, non-merits dispositions do not require a predicate decision on subject-matter jurisdiction:
The Supreme Court has, on several occasions, recognized that a federal court has leeway to choose among threshold grounds for denying audience to a case on the merits.... [A] federal court that dismisses on non-merits grounds before finding subject-matter jurisdiction makes no assumption of law-declaring power that violates separation of powers principles.
See Arar, 532 F.3d at 172 (internal quotation marks, citations, and ellipses omitted). The Supreme Court acted similarly in Iqbal, assuming the viability of a Bivens action in order to decide the case on the basis of pleading and supervisory liability. See Iqbal, 129 S.Ct. at 1948.
Second, the majority professes concern about the “[t]he court’s reliance on information that cannot be introduced into the public record,” which the Court says “is likely to be a common feature of any Bivens actions arising in the context of alleged extraordinary rendition.” Supra at 577. The majority thinks that this concern “should provoke hesitation, given the strong preference in the Anglo-American legal tradition for open court proceedings.” Supra at 577.
“ ‘A trial is a public event. What transpires in the court room is public property.’ ” Richmond Newspapers v. Virginia, 448 U.S. 555, 574 n. 9, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) (plurality opinion) (quoting Craig v. Harney, 331 U.S. 367, 374, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947)). We applaud the majority’s recognition of the fundamental importance of the principle that the courts are presumed to be open. See supra at 598; and see, e.g., Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 604, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). It respects this Circuit’s history of meticulously guarding constitutional protection for “access to the courts” in the sense of the ability of a citizen to see and hear, and in that way to participate in, the workings of the justice system.[38] See, e.g., Huminski v. Corsones, 396 F.3d 53, 56 (2d Cir.2005); Hartford Courant Co. v. Pellegrino, 380 F.3d 83 (2d Cir.2004); ABC, Inc. v. Stewart, 360 F.3d 90 (2d Cir.2004); United States v. Graham, 257 F.3d 143 (2d Cir.2001); Westmoreland v. Columbia Broad. Sys., Inc., 752 F.2d 16 (2d Cir.1984), cert. denied, 472 U.S. 1017, 105 S.Ct. 3478, 87 L.Ed.2d 614 (1985); Joy v. North, 692 F.2d 880 (2d Cir.1982). But it follows not at all, we think, from the presumption of openness however gauged that the open nature of the federal courts is properly weighed as a factor in the Bivens analysis.
The presumption of openness is just that, a presumption. In can be, and routinely is, overcome. We regularly hear, on the basis of partially or totally sealed records, not only cases implicating national security or diplomatic concerns, see, e.g., Doe, 576 F.3d 95; In re Terrorist Bombings of U.S. Embassies in E. Afr. v. Odeh, 552 F.3d 93 (2d Cir.2008), cert. denied, - U.S. --, 129 S.Ct. 2778, - L.Ed.2d - (2009), but those involving criminal defendants’ cooperation with prosecutors, see, e.g., United States v. Doe, 314 Fed.Appx. 350 (2d Cir.2008) (summary or *610 der), other criminal matters, see, e.g., U.S. v. Silleg, 311 F.3d 557, 560 (2d Cir.2002), probation department reports, upon which federal criminal sentences are to a significant extent typically based, see, e.g., United States v. Parnell, 524 F.3d 166, 168 n. 1 (2d Cir.2008) (per curiam); United States v. Molina, 356 F.3d 269, 275 (2d Cir.2004), child welfare, see, e.g., Sealed v. Sealed, 332 F.3d 51 (2d Cir.2003), trade secrets, see, e.g., In re Orion Pictures Corp., 21 F.3d 24 (2d Cir.1994), and any manner of other criminal and civil matters. Hardly a week goes by, in our collective experience, in which some document or fact is not considered by a panel of this Court out of the public eye.
We accommodate the public interest in proceedings before federal courts by rigorously adhering to the presumption of openness, but the presumption is often overcome. The majority’s notion that because the presumption is likely to be overcome in a particular species of case we should therefore foreclose a remedy or otherwise limit our jurisdiction in order to accommodate the public suspicion of secrecy, is misconceived. Denying relief to an entire class of persons with presumably legitimate claims in part because some of their number may lose in proceedings that are held in secret or because secrets may cause some such claims to fail, makes little sense to us. It could work endless mischief were courts to turn their backs on such cases, their litigants, and the litigants’ asserted rights. We are not aware of any other area of our jurisprudence where the ability to overcome the presumption of openness has been relied upon to deny a remedy to a litigant. We do not think it should be here.
CONCLUSION
For the foregoing reasons and to the extent indicated, we respectfully dissent.

. Judges Straub and Sotomayor voted in the en banc poll but do not participate in deciding the case en banc because Judge Straub took senior status prior to the en banc hearing and Judge Sotomayor has been elevated to the Supreme Court. Judge Katzmann recused himself from both the poll and the en banc hearing. Senior Judge McLaughlin, as a member of the original panel, has participated in the en banc consideration. Judge Calabresi participated in the en banc hearing, but has taken senior status since the argument. The author of this opinion has also taken senior status since the hearing, but was a member of the panel that heard the appeal and therefore, like Judge McLaughlin, would have been able to have participated in the en banc hearing in any event. Judge Lynch, who joined the Court since the argument, has not participated in these proceedings.

. See, e.g., Arar Panel Op., 532 F.3d at 193 et seq. (Sack, J., concurring in part and dissenting in part) ("Arar partial panel dissent”).

. We do not dissent from the majority’s conclusions as to personal jurisdiction. The author of this opinion, as a member of the panel that originally heard this appeal, concurred in the panel opinion’s conclusion that relief under the Torture Victim Protection Act is unavailable to Arar. Having reviewed the arguments to the contrary stated in Judge Pooler’s partial dissent, infra, for the reasons stated in it, he now agrees that the relief under the Act is available to Arar. Inasmuch as the en banc Court now holds that it is not available, however, this opinion accepts its unavailability as a matter of law for the purposes of the Bivens analysis that follows.

. Citations to the district court opinion appear in parentheses. The footnotes and subheadings are ours.

. Arar was employed by a privately held Massachusetts-based developer and supplier of software for technical computing. See Compl. ¶ 12.

. That is, changes of plane.

. According to the complaint, on that day, Arar was questioned first by an FBI agent for five hours, Compl. ¶ 29, then by an immigration officer for three hours, id. ¶ 31.

. This is the same federal prison in which, less than a year earlier, Javaid Iqbal was allegedly mistreated. Iqbal, a Muslim inmate accused of conspiracy to defraud the United States and fraud with identification and held post-9/11 in the MDC, allegedly suffered "unconstitutional actions against him in connection with his confinement under harsh conditions ... after separation from the general prison population.” Iqbal v. Hasty, 490 F.3d 143, 147, 148 n. 1 (2d Cir.2007). We held, with respect to Iqbal's subsequent Bivens action, that such treatment was not protected, as a matter of law, by the doctrine of qualified immunity. Id. at 177-78. The Supreme Court subsequently reversed that judgment and remanded, holding that the complaint was insufficiently pleaded as to two high-ranking official defendants. See Ashcroft v. Iqbal, - U.S. -, 129 S.Ct. 1937, 1952, 173 L.Ed.2d 868 (2009). On September 29, 2009, the remaining parties in Iqbal filed a document in this Court stipulating that the appeal was to be "withdrawn from active consideration before the Court ... because a settlement has been reached in principle between Javaid Iqbal and defendant United States.” Iqbal v. Hasty, No. 05-5768-cv (2d Cir. Sept. 30, 2009), "Stipulation Withdrawing Appeal from Active Consideration” dated September 29, 2009.

. I.e., five days after Arar’s arrival in the United States.

. The consulate is in New York City.

. The district court’s description of the facts as alleged in the complaint ends here.

. On October 23, 2007, this Court granted Arar’s motion to take judicial notice of the Report insofar as its existence and the scope of its contents were concerned, but denied the motion insofar as it may have sought judicial notice of the facts asserted in the report. But cf. supra at 583-84 (employing the report as the source for facts relating to Canadian involvement in the Arar incident).

. Following the district court's dismissal of the fourth claim without prejudice and dis *591 missal of the first three claims with prejudice, Arar moved for certification of a final judgment on the first three claims to enable him to appeal them immediately. See Arar v. Ashcroft, No. CV-04-0249 (DGT), 2006 WL 1875375, 2006 U.S. Dist. LEXIS 45550 (E.D.N.Y. July 5, 2006). The district court denied the motion. See id. Arar then declined to replead the fourth claim, apparently in order to obtain this Court's early review of the dismissal of the first three claims, cf. id.
The majority affirms the dismissal of the fourth claim partly “in view of Arar’s rejection of an opportunity to re-plead.’’ Supra at 569. While we do not read that as a suggestion that this claim has been waived on appeal, we note that any such suggestion would be incorrect. We may review the entire judgment. See, e.g., Kittay v. Kornstein, 230 F.3d 531, 541 n. 8 (2d Cir.2000) ("[A] disclaimer of intent to amend the complaint renders the District Court’s judgment final and allows review of the dismissal in this Court.”); Festa v. Local 3 Int’l Brotherhood of Elec. Workers, 905 F.2d 35, 36-37 (2d Cir.1990) (per curiam); Conn. Nat’l Bank v. Fluor Corp., 808 F.2d 957, 960-61 (2d Cir.1987).

. The Supreme Court explained: “The agents were not named in petitioner’s complaint, and the District Court ordered that the complaint be served upon “those federal agents who it is indicated by the records of the United States Attorney participated in the November 25, 1965, arrest of the [petitioner].” App. 3. Five agents were ultimately served.” Id. at 390 n. 2, 91 S.Ct. 1999; see also Bivens, Brief for Respondent at *2 n.l, 1970 WL 116900 (“The apparent contradiction in the title of this case — “Unknown Named” — arises from the fact that after petitioner filed his complaint, the United States Attorney supplied the clerk of the court with the agents’ names. However, as the summonses and their returns indicate, only five agents are apparently involved (App.5-24), rather than six as stated in the case title.”)

. The complaint alleges, inter alia:
Early on October 8, 2002, at about 4 a.m., Mr. Arar was taken in chains and shackles to a room where two INS officials told him that, based on Mr. Arar’s casual acquaintance with certain named individuals, including Mr. Almalki as well as classified information, Defendant Blackman, Regional Director for the Eastern Region of Immigration and Naturalization Services, had decided to remove Mr. Arar to Syria. Without elaboration, Defendant Blackman also stipulated that Mr. Arar’s removal would be consistent with Article 3 of CAT.... (A copy of Defendant Blackman’s decision is attached as Exhibit D [to the complaint]).
Compl. ¶ 47.

. The complaint alleges, inter alia:
The only notice given [Arar’s counsel prior to his interrogation late on the evening of Sunday, October 6, 2002] was a message left by Defendant McElroy, District Director for Immigration and Naturalization Services for New York City, on [counsel’s] voice mail at work that same [Sunday] evening. [She] did not retrieve the message until she arrived at work the next day, Monday morning, October 7, 2002 — long after Mr. Arar's interrogation had ended.
Compl. ¶ 43.

. That rule provides:
Claim for Relief. A pleading that states a claim for relief must contain:
(1) a short and plain statement of the grounds for the court’s jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.
Fed.R.Civ.P. 8(a).

. In response to a question by the Chief Judge as to what cognizable allegations might be made in such a habeas petition, the government said, “Your Honor, I’m not going to speak for what a judge might or might not have said, but in his habeas position and his petition for a stay he could say, look, things are moving quickly, I'm afraid they're going to send me to Syria, don’t let that happen.” Tr. 84; see also id. at 85.

. The Federal Rules of Civil Procedure instruct that "[p]leadings must be construed so as to do justice.” Fed.R.Civ.P. 8(e). Wright and Miller's treatise counsels that ”[t]his provision is not simply a precatory statement but reflects one of the basic philosophies of prac *595 tice under the federal rules.” 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1286 (3d ed.2004). “One of the most important objectives of the federal rules is that lawsuits should be determined on their merits and according to the dictates of justice, rather than in terms of whether or not the averments in the paper pleadings have been artfully drawn.” Id.

. In one sense, every case presents a new context, in that it presents a new set of facts to which we are expected to apply established law. But a new set of facts is not ipso facto a "new context.” We do not decide, based on the difference in factual setting alone, whether or not it is a good idea to allow a plaintiff to avail him or herself of a well-established remedy such as that afforded by Bivens. This is illustrated by cases involving legal contexts where Bivens is well-established, in which courts do not conduct a fresh assessment as to whether a Bivens action is available based on the facts of each case. See, e.g., Groh v. Ramirez, 540 U.S. 551, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (Bivens action for Fourth Amendment violation); McCarthy v. Madigan, 503 U.S. 140, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992) (Bivens action, for Eighth Amendment violation), superseded by statute on other grounds as stated in Booth v. Churner, 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001); Castro v. United States, 34 F.3d 106 (2d Cir.1994) (Fourth Amendment); Armstrong v. Sears, 33 F.3d 182 (2d Cir.1994) (same); Anderson v. Branen, 17 F.3d 552 (2d Cir.1994) (same); see also Hallock v. Bonner, 387 F.3d 147 (2d Cir.2004) (same), rev’d on other grounds, sub nom Will v. Hallock, 546 U.S. 345, 126 S.Ct. 952, 163 L.Ed.2d 836 (2006).

. Shortly after we decided Iqbal, the Supreme Court made clear that by appealing from the district court’s denial of qualified immunity, the defendants placed within our *598 jurisdiction the question of "the recognition of the entire cause of action.” Wilkie, 127 S.Ct. at 2597 n. 4. The district court in Iqbal had specifically rejected the defendants' argument that a Bivens action was unavailable. See Elmaghraby v. Ashcroft, No. 04 CV 01809 JG SMG, 2005 WL 2375202, at *14, 2005 U.S. Dist. LEXIS 21434, at *44-*45 (E.D.N.Y. Sept. 27, 2005). Thus, had we thought that no Bivens action was available, we had the power to resolve Iqbal’s claims on that basis.

. The D.C. Circuit in Harbury concluded that the interrogation in question did not violate the Constitution because it occurred entirely abroad. See Harbury, 233 F.3d at 602-04 (relying upon United States v. Verdugo-Urquidez, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990)).

. The full quotation is:
[T]he freedom of the state in establishing its policy is the freedom of constitutional government and is limited by the requirement of due process of law. Because a State may dispense with a jury trial, it does not follow that it may substitute trial by ordeal. The rack and torture chamber may not be substituted for the witness stand. Because a state may dispense with a jury trial, it does not follow that it may substitute trial by ordeal. The rack and torture chamber may not be substituted for the witness stand.
Brown, 297 U.S. at 285-86, 56 S.Ct. 461.

. "[Rjendition — the market approach — outsources our crimes, which puts us at the mercy of anyone who can expose us, makes us dependent on some of the world’s most unsavory actors, and abandons accountability. It is an approach we associate with crime families, not with great nations.” Philip Bobbitt, Terror and Consent: The Wars for the Twenty-First Century 388 (2008). “[0]ne could get the worst of both worlds: national responsibility for acts as to which the agents we have empowered are unaccountable.” Id. at 387.

. "I do not think that whether the defendants violated Arar’s Fifth Amendment rights turns on whom they selected to do the torturing: themselves, a Syrian Intelligence officer, a warlord in Somalia, a drug cartel in Colombia, a military contractor in Baghdad or Boston, a Mafia family in New Jersey, or a Crip set in South Los Angeles.” Arar partial panel dissent at 205.

. The Court referred by way of example to its previous decisions in United States v. Standard Oil Co., 332 U.S. 301, 311, 67 S.Ct. 1604, 91 L.Ed. 2067 (1947), in which it had *601 concluded that the government had no implied right of action against a company that had allegedly injured a soldier because it trenched upon “federal fiscal policy” particularly delegated to Congress, and Wheeldin v. Wheeler, 373 U.S. 647, 83 S.Ct. 1441, 10 L.Ed.2d 605 (1963), in which the Court found no private right of action under federal law where the defendant’s acts were not asserted to violate the plaintiff's constitutional rights and were governed by state law.

. This appears to reflect a classic logical fallacy, “denial of the antecedent,” which mistakes a necessary condition for a sufficient one. E.M. Adams, The Fundamentals of General Logic 164 (“The truth of the premises does not require the truth of the conclusion. This means that denying the antecedent is an invalid form of the simple conditional argument.”).

. Such a test would be reminiscent of Leo Tolstoy's brother's perhaps apocryphal challenge to Tolstoy to stand in a corner and not think of a white bear. See, e.g., Aylmer Maude, The Life of Tolstoy: First Fifty Years (Dodd, Mead and Co. 1910) 19 (“[Tjhere was also a certain Fanfarónof Hill, up which [my brother] said he could lead us, if only we would fulfil all the appointed conditions. These were: first, to stand in a corner and not think of a white bear. I remember how I used to get into a comer and try (but could not possibly manage) not to think of a white bear.”).

. Although there is some disagreement in the Circuits regarding precisely when, following arrest, abuse of detained persons is to be analyzed under principles of substantive due process, we think Judge Posner's comment as to why those principles must apply at some point is insightful and remains valid.

. While cases permitting pretrial detainees to bring Bivens actions for violations of their substantive due process rights support the availability of a Bivens action here, Arar’s substantive due process claim should not be evaluated under the standard for assessing the claims of persons who, unlike Arar, were detained pretrial rather than for the purpose of interrogation.

. We have not been asked by the parties to examine the possibility that Arar has pled facts sufficient to raise a claim under theories other than substantive due process — such as under the Fourth Amendment,' the self-incrimination clause of the Fifth Amendment, or even the Eighth Amendment. Because this is an appeal from a dismissal on the facts pleaded in the complaint under Rule 12(b)(6), we think that even if this Court were to consider such an alternate theory and conclude that it was valid, the case would be subject to remand to the district court for further proceedings on that theory.

. Our discussion is limited to the government’s invocation of the state-secrets privilege in the context of civil litigation. The protection of state secrets in the course of a criminal prosecution would likely raise many different and difficult issues in light of, among other things, the defendant’s rights under the Fifth and Sixth Amendments.

. The district court's full statement bears repeating:
It is important to emphasize that the result reached here is required by settled, controlling law. It is in no way an adjudication of, or comment on, the merit or lack of merit of El-Masri's complaint. Nor does this ruling comment or rule in any way on the truth or falsity of his factual allegations; they may be true or false, in whole or in part. Further, it is also important that nothing in this ruling should be taken as a sign of judicial approval or disapproval of rendition programs; it is not intended to do either. In times of war, our country, chiefly through the Executive Branch, must often take exceptional steps to thwart the enemy. Of course, reasonable and patriotic Americans are still free to disagree about the propriety and efficacy of those exceptional steps. But what this decision holds is that these steps are not proper grist for the judicial mill where, as here, state secrets are at the center of the suit and the privilege is validly invoked.
Tenet, 437 F.Supp.2d at 540-41.

. We cite El-Masri not to endorse its conclusions, but as evidence that the procedures to be applied here are not in any sense novel.

. Cf. Bivens, 403 U.S. at 410, 91 S.Ct. 1999 (Harlan, J., concurring) ("I simply cannot agree with my Brother BLACK that the possibility of 'frivolous' claims — if defined simply as claims with no legal merit — warrants closing the courthouse doors to people in Bivens’ situation. There are other ways, short of that, of coping with frivolous lawsuits.”).

. There have been assertions that the state-secrets invocation in Reynolds, in which the modern form of doctrine was first set forth, was a cover-up of government misfeasance, not an attempt to protect legitimate state secrets. See, e.g., Barry Siegel, Claim of Privilege at 205-10; Herring v. United States, No. A 03 Civ. 5500(LDD), 2004 WL 2040272, at *2, 2004 U.S. Dist. LEXIS 18545, at *6-*7 (E.D.Pa. Sept. 10, 2004); but see Herring v. United States, 424 F.3d 384, 386 (3d Cir.2005) (deciding, after review of the report, that the government's "assertion of military secrets privilege for [the] accident report [in Reynolds ] ... was [not a] fraud upon the court"), cert. denied, 547 U.S. 1123, 126 S.Ct. 1909, 164 L.Ed.2d 685 (2006). The government has recently implemented procedures that heighten the standard governing what information can be protected under the privilege and create multiple levels of oversight requiring that a State Secrets Review Committee, an Assistant Attorney General, the Deputy Attorney General, and the Attorney General approve the assertion of the privilege before the government attempts to invoke it in any particular case. See Policies and Procedures Governing Invocation of the State Secrets Privilege (Sept. 23, 2009), available at http:// www.justice.gov/opa/documents/state-secretprivilieges.pdf.

. Questions that have been raised include: Did the Reynolds dissenters, and the Third Circuit and Eastern District of Pennsylvania before them, see Reynolds v. United States, 192 F.2d 987, 990 (3d Cir.1951), have the better of the argument when concluding that the judicial role is not fully exercised in any case without an in-chambers, ex parte review of the allegedly privileged material? Cf. State Secret Protection Act of 2009, H.R. 984, 111th Cong. § 5(a) ("Once the Government has asserted the privilege ... the court shall undertake a preliminary review of the information the Government asserts is protected by the privilege...."); State Secrets Protection Act, S. 417, 111th Cong. § 2 (2009) (providing that, absent certain exceptions "the United States shall make all evidence the United States claims is subject to the state secrets privilege available for the court to review, consistent with [specified requirements], before any hearing conducted under this section"). Should the monetary loss occasioned as the result of the invocation of the privilege fall invariably and exclusively on plaintiffs? See Enemy Combatants, 75 Geo. Wash. L.Rev. at 1312-13. How finely grained a showing should be required before an action is dismissed in light of a successful state-secrets invocation? See Editorial, The State-Secrets Privilege, Tamed, N.Y. Times, Apr. 30, 2009, at A26 (opining on what it characterized as "the affront to civil liberties and the constitutional separation of powers in the Justice Department’s argument that the executive branch is entitled to have lawsuits shut down whenever an official makes a blanket claim of national security"); see also msnbc.com, "Full transcript of President Barack Obama's news conference, Apr. 29, 2009,” http://www. msnbc.msn.com/id/30488052// (The President: “I actually think that the state secret doctrine should be modified. I think right now it’s overbroad.”).

. This is "access to courts” in a sense quite different from the "access to courts” argument made by Arar referring to the frustration of his ability to seek relief from the judiciary. Cf. Huminski v. Corsones, 386 F.3d 116, 145 n. 30 (2d Cir.2004) (distinguishing between a litigant’s due process right of access and the press and public’s right of access under the First Amendment).